## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

**HINES IMMIGRATION LAW, PLLC**,
Rosedale Tower, 1700 West Highway 36,
Suite 120, Roseville, MN 55113,

**THE ADVOCATES FOR HUMAN
RIGHTS**, 330 Second Avenue South, #800
Minneapolis, MN 55401,

     *Plaintiffs,*

*v.*

**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**, 5107 Leesburg
Pike Falls Church, VA 22041,

**U.S. DEPARTMENT OF JUSTICE**, 950
Pennsylvania Avenue NW, Washington, DC
20530,

**DAREN K. MARGOLIN**, in his official
capacity as Director of the Executive Office
for Immigration Review, 5107 Leesburg Pike
Falls Church, VA 22041,

**PAMELA J. BONDI**, in her official capacity
as U.S. Attorney General, 950 Pennsylvania
Avenue NW, Washington, DC 20530,

    *Defendants.*

**Case No. 26-cv-_____**

**EMERGENCY RELIEF
REQUESTED**

## COMPLAINT

**INTRODUCTION**

1. In an abrupt departure from longstanding policy and practice, Defendant Executive Office for Immigration Review (EOIR), a sub-agency of Defendant Department of Justice (DOJ), has made a decision to fast-track the immigration proceedings of non-detained Somalis on a dedicated national docket before a handpicked subset of immigration judges (IJs).

2. This new "Somali Fast-Track Policy," which was introduced in late January 2026 and has accelerated in recent weeks, truncates the timeline for non-detained Somali immigrants across the country to consult with counsel and establish their claims and entitlement to relief from removal. It likewise makes the work of Plaintiffs—legal service providers seeking to assist Somali immigrants in that process—monumentally more difficult and, in many cases, nearly impossible.

3. The Somali Fast-Track Policy is part and parcel of the Trump-Vance Administration's systematic efforts to eviscerate immigrants' access to required process and interfere with the ability of organizations like Plaintiffs to defend those immigrants' rights. The Policy is unlawful and must be vacated and set aside. In the interim, it must be stayed to avoid ongoing irreparable injury.

4. At the outset, the Somali Fast-Track Policy is an unprecedented effort to deny critical procedural guarantees in removal hearings to individuals of one nationality. It follows months of commentary from President Trump negatively targeting Somalis, who make up less than 1 percent of the U.S. population and are mostly U.S. citizens. President Trump has stated that Somalis are "very, very rough people," "filthy," "dirty," "disgusting," "low-IQ people," "terrorizing" and "taking over the once great State of Minnesota," "roving the streets looking for prey," "ripping us off," "pirates," and "garbage" who "complain and do nothing but bitch" and "contribute nothing."

5. Indeed, in the two months leading up to this Policy, the President explicitly stated of Somali immigrants: "We're getting a lot of their people out"; "Send them back to where they came from"; "I don't want them in our country. I'll be honest with you, OK? Somebody would say, oh, that's

1

not politically correct. I don't care. I don't want them in our country. . . . Their country stinks and we don't want them in our country"; "They're scammers. They always will be. And we're getting them out" as "we liberate our country from this cultural scourge."

6. The Trump-Vance Administration's attacks on Somalis go well beyond the rhetorical. In January 2026, the Administration announced the termination of Temporary Protected Status for Somalis. And a federal court recently concluded that, over the past three months, the Department of Homeland Security (DHS) "adopted a policy authorizing federal immigration officers to conduct investigatory stops [of Somali and Hispanic individuals] based on ethnicity or race without reasonable suspicion that the individuals were violating immigration laws." *Hussen v. Noem*, No. 26-CV-324, 2026 WL 657936, at *37 (D. Minn. Mar. 9, 2026).

7. To further effectuate the Administration's targeting of Somalis, the Somali Fast-Track Policy imposes several changes to the regular process for hearing non-detained immigration cases for this one group of immigrants. Among other changes, the Policy:

    a. Sets master calendar hearings for non-detained Somali immigration cases in which such hearings were previously vacated and are otherwise unnecessary;

    b. Sets and advances individual merits hearings for non-detained Somalis on short notice— for no later than Summer 2026, and in many cases mere weeks away—even in cases where such hearings were previously scheduled for 2027 or 2028, providing minimal time for counsel to prepare; and

    c. Sets all or nearly all these master calendar hearings and individual merits hearings for non-detained Somalis before a subset of IJs who otherwise sit outside the relevant jurisdiction and in many cases have higher-than-average removal rates.

8. The Somali Fast-Track Policy—which truncates the timeline for non-detained Somalis and their attorneys to effectively prepare their cases and will very likely result in the removal of Somali

2

immigrants who are eligible for protection—irreparably harms Plaintiffs, legal service providers with a collective mission of working to ensure access to full and fair proceedings before the immigration courts for as many noncitizens as possible. This is a high-stakes mission: Plaintiffs aim to protect client rights, facilitate lawful residency and citizenship, fight deportation, and secure humanitarian protection for those fleeing persecution or violence.

9. The Policy undermines Plaintiffs' core work by making it nearly impossible for Plaintiff Hines Immigration Law, PLLC (the Hines Firm) to represent its existing clients and considerably straining Plaintiff The Advocates for Human Rights' (AHR) ability to operate its regular programs. Indeed, the Hines Firm has already been forced to turn away business and divert precious resources to respond to and stave off the worst effects of the Policy for its existing clients. And AHR has diverted time and resources away from its current clients, volunteers, and programs to handle the growing need for support on cases for non-detained Somali individuals affected by the Policy.

10. The Policy violates the Administrative Procedure Act (APA) and the U.S. Constitution and must be set aside. Among other things, the Policy is contrary to law because it eviscerates protections enshrined in the Immigration and Nationality Act (INA), including the right to counsel and to a full and fair hearing. The Policy is also arbitrary and capricious. Defendants have provided no public acknowledgement or explanation for the Policy, and it is both unreasoned and unreasonable. In addition, the Policy violates the Due Process Clause of the Fifth Amendment by denying Somali noncitizens a full and fair opportunity to be heard before being deported from this country, the Equal Protection guarantee of the Fifth Amendment by intentionally discriminating based on national origin, and the First Amendment's free speech and association rights by preventing Plaintiffs from providing effective representation to individuals who wish to retain their services.

11. Without relief from this Court, the constitutionally and congressionally mandated system that ensures noncitizens are accorded basic fairness before they may be expelled from this country will cease to function for Somalis. The Court's intervention is necessary to prevent further harm to Plaintiffs, the clients and populations they serve, and the public.

## PARTIES

12. Plaintiff Hines Immigration Law, PLLC is a private law firm in Roseville, Minnesota that specializes in complex immigration cases and has a mission to provide expert, high-quality, culturally sensitive, and trauma-informed legal services to its clients. The firm's owner and sole lawyer, Kelsey Hines, currently represents 113 non-detained asylum applicants before EOIR, of whom 73 are natives and citizens of Somalia.

13. Plaintiff The Advocates for Human Rights is an independent, nonpartisan nonprofit organization founded in 1983 and headquartered in Minneapolis, Minnesota. AHR works to promote and protect internationally recognized human rights standards by promoting civil society and reinforcing the rule of law. AHR's Immigration Legal Services Program (ILS) provides free legal representation to low-income immigrants in the upper Midwest, including non-detained Somali individuals in removal proceedings. ILS has eight full-time staff attorneys and two full-time fellows who provide direct services and pro bono support. AHR works with more than 1,600 volunteer attorneys, and it is often called upon by community members, individual immigrants, and lawyers who are looking for guidance on immigration matters.

14. Defendant EOIR is a sub-agency of Defendant DOJ responsible for adjudicating administrative claims concerning federal immigration laws, including proceedings before the immigration courts. EOIR adopted the challenged Policy. EOIR is headquartered in Falls Church, Virginia.

4

15. Defendant DOJ is a cabinet-level department of the federal government headquartered in Washington, D.C.

16. Defendant Daren K. Margolin was appointed as EOIR Director in October 2025. Defendant Margolin is responsible for the direction and supervision of the immigration courts. He is sued in his official capacity.

17. Defendant Pamela J. Bondi is the Attorney General of the United States. She is responsible for the administration of the immigration laws and oversees EOIR. She is sued in her official capacity.

## JURISDICTION AND VENUE

18. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331; the claims arise under federal law, including the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq.

19. The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, 28 U.S.C. §§ 2201–2202, the All Writs Act, and the Court's inherent equitable powers. The APA further authorizes the Court to stay, set aside, enjoin, or vacate agency action that is outside the statutory authority of the agency; is arbitrary, capricious, or contrary to constitutional right; or is otherwise not in accordance with law. 5 U.S.C. §§ 705–706.

20. Venue is proper under 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States, the action does not involve real property, and Defendants DOJ and Bondi reside in this District.

## BACKGROUND

### Overview of Immigration Court Proceedings

21. Immigration law is notably complex. *See, e.g.*, *Ardestani v. INS*, 502 U.S. 129, 138 (1991); *Castro-O'Ryan v. INS*, 847 F.2d 1307, 1312 (9th Cir. 1987). The consequences that flow from immigration proceedings are also notably severe, often involving matters of life or death. *See, e.g.*,

5

*Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) ("[D]eportation is a particularly severe 'penalty.'" (citation omitted)); *Nken v. Holder*, 556 U.S. 418, 436 (2009) ("Of course there is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm."). That is especially true in asylum cases, where noncitizens face the threat of persecution, torture, or death if removed.

22. In the face of these complexities, the INA guarantees certain basic protections. When DHS wishes to remove a noncitizen, subject to exceptions not relevant here, it must obtain an order of removal from an immigration judge, who is charged with conducting removal proceedings, finding facts, and granting relief or ordering removal. *See* 8 U.S.C. § 1229a(a)(1), (c)(1)(A).

23. A noncitizen typically appears before an IJ in two types of hearings for their immigration case: master calendar hearings and individual merits hearings. At a master calendar hearing, the IJ is required to explain the noncitizen's rights, the charges against the noncitizen, and the nature of the proceedings. *See* 8 C.F.R. § 1240.10(a)(1)–(7). The scope of these hearings does not include final adjudication of the noncitizen's case. *See* EOIR Policy Manual, Part II § 3.14(a), (e), https://www.justice.gov/eoir/policy-manual-eoir (last visited Mar. 24, 2026). If the noncitizen is unrepresented, the IJ must provide a list of free or low-cost legal service providers and give the noncitizen an opportunity to find counsel (unless the noncitizen waives counsel and elects to proceed *pro se*). *See* 8 C.F.R. § 1240.10(a)(1)–(2); *id.* § 1003.16; 8 U.S.C. § 1229a(b)(4)(A).

24. A noncitizen may have more than one master calendar hearing. They may also request a continuance of their master calendar hearing if they would like more time to speak to an attorney, prepare an application for relief, or otherwise think about how to proceed with their case. 8 C.F.R. § 1003.29; *id.* § 1240.6.

25. On the other hand, master calendar hearings are regularly vacated when an attorney has appeared on behalf of a non-detained respondent. *See* EOIR Policy Manual, Part II § 2.1(b)(1)(B).

If an attorney submits written pleadings and the master calendar hearing is vacated, the case is placed in a queue to be set for an individual merits hearing.

26. If a noncitizen has applied for relief from removal, in the form of asylum, withholding of removal, Convention Against Torture (CAT) protection, cancellation of removal, or adjustment of status, then the IJ must schedule an individual merits hearing. 8 C.F.R. § 1240.11.

27. At their individual merits hearing, a noncitizen must have the opportunity to testify, examine witnesses, and present evidence showing why the IJ should grant their application for relief. 8 U.S.C. § 1229a(b)(4)(B); 8 C.F.R. § 1240.10(d).

28. For noncitizens who are represented and not detained, supporting documents must be submitted at least 30 days in advance of the individual merits hearing. EOIR Policy Manual, Part II § 2.1(b)(2)(B). If a noncitizen wishes the IJ to consider a filing despite its untimeliness, they must make an oral or written motion to accept the untimely filing. *Id.* § 2.1(d)(3).

29.  An individual merits hearing is typically the final hearing in a noncitizen's immigration case, after which the IJ will make a decision whether to grant or deny the application for relief. 8 C.F.R. § 1240.12; *id.* § 1003.37.

### Individual Merits Hearing Scheduling and Preparation

30. Consistent with its importance to a noncitizen's case and the complexities of preparation, an individual merits hearing for someone who is not detained is typically set with advance notice of at least one year. *See* Policy Memorandum 21-13 from James R. McHenry III, Dir. of EOIR, at 5 (Jan. 8, 2021), https://perma.cc/N93N-LEG9 (hereinafter "PM 21-13") (stating that "an individual merits hearing is typically scheduled far in advance and generally only after considering the availability of a respondent's representative" and that the advanced scheduling "provides ample opportunity for preparation time, and often involve interpreters or third-party witnesses whose schedules have been carefully accommodated"); *Matter of J-A-F-S-*, 29 I. & N. Dec. 195, 197 (BIA

2025) ("Individual hearings for non-detained cases are frequently scheduled far in advance due to the Immigration Courts' extremely high caseloads."). EOIR guidance expressly recognizes that this substantial advance notice is critical to attorney preparation. *See, e.g.*, PM 21-13, at 5 (explaining that "the time between a master calendar hearing and an individual merits hearing, which often exceeds one year in a non-detained case, already encompasses substantial time for preparation"). The regulations, too, provide for advance attorney preparation. They require that practitioners must "[r]easonably consult with the client about the means by which the client's objectives are to be accomplished," which includes "the duty to meet with the client sufficiently in advance of a hearing or other matter to ensure adequate preparation of the client's case." 8 C.F.R. § 1003.102(r)(2) (setting forth requirements to avoid sanction).

31. To prepare effectively and efficiently, attorneys often complete the vast majority of their preparation for their client's individual hearing after the date for that hearing is set, especially in the asylum context. That is because many aspects of asylum hearing preparation—including finalizing country conditions reports, referring and obtaining a psychological evaluation, and conducting legal research—would otherwise be out-of-date by the time the merits hearing took place.

32. In recognition of the time necessary to prepare for and the seriousness of the proceedings, the regulations also subject practitioners to discipline if they do not provide competent representation, which "requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." 8 C.F.R. § 1003.102(o). A practitioner's "workload must be controlled and managed so that each matter can be handled competently." *Id.* § 1003.102(q)(1).

33. EOIR guidance similarly warns that sanctions may be appropriate for an attorney "who takes on more cases than he or she can responsibly and professionally handle." PM 21-13, at 5.

8

**Independence of Individual Immigration Judges**

34. EOIR regulations vest broad discretion in individual immigration judges. In deciding cases before them, IJs "shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the Act and regulations that is necessary or appropriate for the disposition or alternative resolution of such cases." 8 C.F.R. § 1003.10(b).

35. The Office of the Chief Immigration Judge is responsible "for the supervision, direction, and scheduling of the immigration judges in the conduct of the hearings and duties assigned to them." *Id.* § 1003.9(b). But the Chief Immigration Judge "shall have no authority to direct the result of an adjudication assigned to another immigration judge." *Id.* § 1003.9(c).

36. EOIR guidance likewise emphasizes the independence of IJs. It makes clear that "all adjudicators at EOIR are independent in their decision-making in the cases before them." Policy Memorandum 25-42 from Sirce E. Owen, Acting Dir. of EOIR, at 1 (Aug. 22, 2025), https://perma.cc/HT47-6XSN (hereinafter "PM 25-42"). Accordingly, "no EOIR employee or officer can direct any adjudicator to rule in a particular way on a matter before him or her in the first instance." *Id.* at 2.

37. Similarly, EOIR guidance provides that "the designation of a case as a priority is not intended to limit the discretion afforded an Immigration Judge under applicable law, nor is it intended to mandate or direct a specific outcome in any particular case." Policy Memorandum 25-47 from Sirce E. Owen, Acting Dir. of EOIR, at 3 (Sep. 12, 2025), https://perma.cc/95ML-C966 (hereinafter "PM 25-47").

**Rights of Noncitizens in Immigration Proceedings**

38. The INA and the Due Process Clause of the Fifth Amendment require full and fair proceedings for noncitizens facing removal. "[D]ue process requires that [deportation] hearings be

9

fundamentally fair." *Rosales v. ICE*, 426 F.3d 733, 736 (5th Cir. 2005); *see also Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005); *Borges v. Gonzales*, 402 F.3d 398, 408 (3d Cir. 2005).

39. Under the INA, noncitizens are entitled to legal representation of their own "choosing," but "at no expense to the Government." 8 U.S.C. §§ 1229a(b)(4)(A), 1362. And though the INA does not provide for universal appointed counsel, it does recognize the significant role legal representation plays in the process. *See, e.g.*, *id.* § 1158(d)(4)(A)–(B) (requiring the government to advise asylum applicants "of the privilege of being represented by counsel" and to provide them with an updated list of people "who have indicated their availability to represent [noncitizens] in asylum proceedings on a pro bono basis"); § 1229(a)(1)(E) (providing that noncitizens "may" be represented by counsel and that they "will be provided (i) a period of time to secure counsel under subsection (b)(1) and (ii) a current list of counsel prepared under subsection (b)(2)"); § 1229(b)(2) (requiring the government to provide lists to noncitizens of pro bono legal services providers); § 1228(a)(2) (requiring that, in the case of noncitizens facing removal based on certain convictions, "the Attorney General shall make reasonable efforts to ensure that the [noncitizen's] access to counsel and right to counsel under section 1362 of this title are not impaired").

40. EOIR regulations recognize this right to counsel as well. In a removal proceeding, the immigration judge shall "[a]dvise the respondent of his or her right to representation, at no expense to the government, by counsel of his or her own choice authorized to practice in the proceedings." 8 C.F.R. § 1240.10(a)(1).

41. In addition to the right to representation, the INA addresses various other rights of noncitizens in removal proceedings, including "a reasonable opportunity to examine the evidence," an opportunity "to present evidence," and an option "to cross-examine witnesses presented by the Government." 8 U.S.C. § 1229a(b)(4)(B). "[A] complete record shall be kept" of these removal proceedings. *Id.* § 1229a(b)(4)(C). Similarly, EOIR regulations require the immigration judge to

10

"[a]dvise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him or her, to present evidence in his or her own behalf and to cross-examine witnesses presented by the government." 8 C.F.R. § 1240.10(a)(4).

42. Being represented by counsel can make an enormous difference for a noncitizen's chances of success: according to one study, immigrants with attorneys fared better at every stage of the process and were nearly five times more likely than their unrepresented counterparts to obtain relief if they sought it. Ingrid Eagly & Steven Shafer, Am. Immigr. Council, *Access to Counsel in Immigration Court*, at 2–3 (Sep. 2016), https://perma.cc/2N67-528M.

### The Somali Fast-Track Policy

43. Beginning in late January 2026, Defendants abruptly departed from the above-described legal framework and status quo with respect to immigration cases for non-detained Somali nationals.

44. This departure immediately follows President Trump's repeated commentary negatively targeting Somalis. For example, in late 2025, the President explicitly stated of Somali immigrants: "We're getting a lot of their people out"; "Send them back to where they came from"; "I don't want them in our country. I'll be honest with you, OK? Somebody would say, oh, that's not politically correct. I don't care. I don't want them in our country. . . . Their country stinks and we don't want them in our country"; "They're scammers. They always will be. And we're getting them out" as "we liberate our country from this cultural scourge."

45. Of the 3.3 million pending cases in immigration court, roughly 3,200 involve Somali nationals, according to the latest data from the Transactional Records Access Clearinghouse (TRAC) (a data gathering and distribution organization founded at Syracuse University that provides comprehensive information about the federal government's enforcement activities, including immigration courts). About 2,700 of those cases involve non-detained Somali nationals.

11

Around half of both detained and non-detained Somali cases are out of Minnesota, home to the largest Somali community in the country, but there are also more than a hundred pending cases involving Somali nationals in each of Washington, Ohio, Illinois, and California, and several in other jurisdictions.

46. EOIR has adopted a policy, which it has been implementing over the past two months, to rapidly set or advance immigration hearing dates—both master calendar hearings and individual merits hearings—in non-detained Somali nationals' immigration cases, without any affirmative request by DHS such as a motion to advance or set hearings. Rather, DHS representatives have made statements on the record suggesting that they do not care if a matter "gets advanced or not."

47. While the Somali Fast-Track Policy has not been publicly promulgated, its existence is evident from Defendants' actions and the statements of individual IJs. Specifically, the Policy requires resolving the immigration cases of non-detained Somalis on a dedicated national docket, before a small subset of handpicked IJs, on a highly accelerated timeline, which diminishes the fundamental fairness of Somalis' immigration removal proceedings.

48. Pursuant to this Policy, IJs are scheduling master calendar hearings with as little as one week's notice, even when there is no discernable need for such a hearing because, for example, the Somali immigrant's attorney has already submitted written pleadings and the case has been placed in the scheduling queue for an individual merits hearing.

49. Individual merits hearings that were previously unscheduled—or scheduled to take place in late 2026, 2027, or even 2028—have now been scheduled with as little as one month's notice and no later than July 2026. Because supporting evidence generally must be submitted 30 days before the merits hearing—or risk not being considered—this timetable means attorneys in some cases have almost no time to gather and submit evidence. If a hearing is scheduled 35 days out, for example, the attorney has only five days to gather and submit supporting documents, which can

12

be voluminous and extremely time-consuming to prepare. And as discussed above, it is impractical and strategically disadvantageous for an attorney to begin these extensive preparations before a merits hearing date is set.

50. All or nearly all hearings for non-detained Somali nationals—including those that were previously assigned to other IJs—have been scheduled with a small subset of IJs, including Chief IJ Teresa Riley (who sits in Cleveland, OH), Assistant Chief IJ Sherron Ashworth (Oakdale, LA), Assistant Chief IJ Craig Defoe (Chicago, IL), Assistant Chief IJ Kevin Riley (Los Angeles, CA), IJ Chris Brisack (Conroe, TX), IJ Andrew Caborn (Conroe, TX), IJ Nina Carbone (Denver, CO), IJ Guy Grande (San Diego, CA), IJ Philip Taylor (Atlanta, GA), and IJ Abdias Tida (Houston, TX).

51. These IJs appear to be exclusively hearing Somali cases. They have frequently scheduled multiple hearings for the same day and time slot, often for shorter periods than typically allotted.

52. In almost all these cases, the IJs are physically located in venues other than those where the Somali nationals and their attorneys live and are joining the proceedings remotely via Webex. Before the adoption of the Policy, Somali nationals and their attorneys typically appeared in person before IJs physically located in the same venue, and there are still active IJs that could hear the cases of Somali nationals in person.

53. There are some striking similarities across the assigned immigration judges. For example, four of the IJs assigned to this special Somali docket are supervisors. And several others are assigned to sit on courts where they typically hear the cases of detained individuals—unlike the non-detained Somali nationals whose cases are now being assigned to them.

54. Until the recent adoption of the Somali Fast-Track Policy, it was highly unusual for the cases of non-detained individuals to be heard remotely by IJs sitting in another part of the country.

55. Based on available data from TRAC and Mobile Pathways (a nonprofit organization that compiles immigration court data), many of these IJs have substantially higher removal rates and

13

lower asylum grant rates compared to the national average. *See Judge-by-Judge Asylum Decisions in Immigration Courts FY 2020-2025*, TRAC (Nov. 7, 2025), https://perma.cc/YSH3-X4PG; *Judge Profiles*, Mobile Pathways, https://perma.cc/UM3X-8838 (use "Select a Judge" dropdown menu) (last visited Mar. 24, 2026).

56. The IJs handling Somali cases have routinely denied or ignored requested continuances for master calendar hearings, even when the attorneys representing noncitizens have unavoidable direct scheduling conflicts—such as another hearing at the same time on the same day before another IJ.

57. And even when these IJs are granting requested continuances for master calendar hearings, they are continuing them only briefly—often for just a matter of days or about a week—or simply vacating them and proceeding directly to individual merits hearings.

58. When scheduling individual merits hearings, IJs have stated without elaboration that their "expedited" calendars available for scheduling "only go out" until a certain date—typically in June or July—and that they are unable to schedule beyond that date. In the past, IJs have scheduled merits hearings for as far as two or three years out, with no indication that their calendars could not "go out" that far.

59. The IJs have also made clear that resolving cases on "this docket"—presumably referring to the docket of Somali nationals—is a "priority," that "[they]'ve got to hear all of them," that "we're all going to have to deal with this docket one way or the other," and that they have "limited options" to "accommodate counsel" when scheduling hearings. Several IJs have told counsel, in response to questions about why they cannot schedule hearings past a certain date, that their "hands are tied." IJs have also told counsel they should raise their scheduling concerns with the "powers that be."

14

60. On information and belief, Somali nationals have been singled out for placement on this new fast-track docket.

**Harm to Plaintiff Hines Immigration Law, PLLC**

61. Plaintiff Hines Immigration Law, PLLC is the private law firm of a solo practitioner who specializes in non-detained asylum cases, largely in Minnesota. Absent this Court's intervention, the Somali Fast-Track Policy will continue to irreparably harm the Hines Firm's core work, business interests, reputation, and clients.

62. Providing high-quality legal representation to non-detained asylum applicants before EOIR is at the heart of the Hines Firm's core business activities. The Policy substantially impedes this core work because it significantly compresses the timeline on which the Hines Firm must prepare for each Somali client's individual merits hearing—from at least a year to fewer than four months, and in some cases, mere weeks. The impact of this change on the Hines Firm is staggering. Kelsey Hines—the firm's founder and sole attorney—undertook her existing caseload with the reasonable expectation that individual merits hearings would proceed at the usual pace, with at least one year to prepare. Ms. Hines typically invests at least 120 hours preparing for each merits hearing. Under the Policy, Ms. Hines will likely have to prepare 71 Somali cases, all of which involve existing clients, for merits hearings over the next four months—which will require working more than 8,520 hours during a 19-week period to give each case the attention it requires. Even if Ms. Hines were to continue working 12-hour days, seven days a week, she would be almost 7,000 hours short. As a result, absent massive and very likely infeasible changes to its business model, it is essentially impossible for the Hines Firm to meet its core business obligations to its clients—both Somali and those of other nationalities—while the Policy remains in place. The Policy also restricts Ms. Hines's exercise of her own right to provide representation to individuals

15

who wish to retain her services. The Hines Firm has already been forced to divert resources from its other ongoing matters to combat the effects of the Policy.

63. Relatedly, the Hines Firm is facing and will continue to face significant monetary injury if the Policy continues. Because the Hines Firm cannot possibly maintain even its current caseload unless it hires and pays for additional attorneys—which is itself not feasible under the circumstances—it will lose paying clients. Indeed, based on advice she has received from ethics counsel, Ms. Hines expects that she will need to withdraw from existing cases because she may be unable to meet her ethical obligations to her clients while the Policy is in place. Meanwhile, the Hines Firm has been forced to cease accepting any new clients due to the current volume of cases. This upends the Hines Firm's regular flow of client intake and could create challenges for the business down the road. And the Policy is already wreaking havoc on the Hines Firm's finances because the firm's typical payment schedule is tied to individual hearing dates. Clients have been struggling to make payments on expedited timelines, and therefore the Hines Firm has not been able to pay its sole attorney a full salary.

64. The Policy will likewise cause the Hines Firm to suffer reputational harms. Ms. Hines has devoted her career to immigration law and has worked to build a sterling local reputation for her firm in that field. Because of the Policy, however, Ms. Hines has been forced to prepare for individual hearings on a compressed timeline and therefore must withdraw from representations of both Somali and other clients and turn down new business. The Policy also puts the Hines Firm's high grant rate for defensive asylum cases at risk, as it forces Ms. Hines to present her clients' cases with significantly less preparation and puts her in front of IJs who are predisposed to deny asylum claims. In addition to the harm to the firm's clients, these changes threaten to cause irreparable and incalculable harm to the Hines Firm's reputation and standing in the community.

16

65. Finally, by denying the Hines Firm's clients the right to fair proceedings guaranteed by the INA and the Due Process Clause, which also includes the right to equal protection, the Somali Fast-Track Policy harms third parties with whom the Hines Firm has a close relationship: clients who seek to receive its assistance in navigating removal proceedings before EOIR. The Hines Firm's Somali clients face significant obstacles to bringing litigation themselves, especially given their fear of retaliation from the government and the high stakes of their individual proceedings.

**Harm to Plaintiff The Advocates for Human Rights**

66. Plaintiff The Advocates for Human Rights is a Minneapolis-based nonprofit organization that works to promote and protect human rights worldwide, including by providing free, high-quality legal representation to low-income immigrants in the Upper Midwest. Without relief, the Somali Fast-Track Policy will continue to irreparably harm AHR by impairing its core programs, frustrating the organization's mission, requiring AHR to divert resources to meet its communities' critical need for support, and injuring its clients.

67. Facilitating high-quality immigration legal services and observing immigration court proceedings are at the heart of AHR's core business activities. The Policy impairs AHR's ability to undertake these activities. First, because the Policy has overwhelmed the capacity of the private attorneys who specialize in this area and with whom AHR frequently partners, AHR has been unable to find volunteer attorneys to handle the new urgent requests for representation from non-detained Somali individuals whose cases are being rapidly advanced. Instead, AHR's staff attorneys have taken on the work of ensuring that the unrepresented Somalis reaching out to them have at least some support and guidance going into their upcoming hearings, though they are unable to provide full representation given their own significant capacity limitations. Second, because hearings taking place pursuant to the Somali Fast-Track Policy are largely being conducted virtually via Webex, AHR's volunteer court observers have not had access to the

proceedings. This aspect of the Policy makes it very difficult for AHR to document and report on what is going on during immigration hearings for Somalis.

68. These developments have presented obstacles that unquestionably frustrated AHR's mission. The Policy makes it more difficult for AHR to ensure that fundamental human rights are protected in our immigration system through representation and observation, to reinforce the rule of law by engaging volunteer attorneys in pro bono services, and to provide rapid response to the influx of inquiries it is receiving from members of the community.

69. The Policy has also forced AHR to divert staff time from its core programs to meet the pressing needs that the Policy creates. For example, AHR's new managing attorney has shifted her time and attention away from her supervision and management responsibilities to develop an emergency response to the Policy. Moreover, every time AHR's attorneys take on a new urgent legal consult for a Somali individual who is either unrepresented or newly needs legal assistance because their retained counsel is unable to continue representing them, that puts a significant strain on their ability to manage their other clients and projects.

70. Finally, the Policy denies AHR's staff and volunteer attorneys the right to provide effective representation to their clients, and it denies AHR's clients the right to fair proceedings and equal protection.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the APA, 5 U.S.C. § 706(2)(A), (B) – Contrary to Law and Constitutional Right
(All Plaintiffs)**

71. The paragraphs above are incorporated and reasserted as if fully set forth here.

72. The Somali Fast-Track Policy is final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which rights or obligations have been determined, or from which

18

legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted).

73. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "contrary to constitutional right." 5 U.S.C. § 706(2)(A), (B).

74. The Somali Fast-Track Policy is contrary to law because it violates the INA in at least three ways.

75. First, the INA guarantees a noncitizen "the privilege of being represented (at no expense to the Government) by [] counsel . . . as he shall choose," 8 U.S.C. § 1362; *see also id.* § 1229a(b)(4)(A). The Policy's fast-tracking makes it nearly impossible for immigration attorneys to adequately prepare for individual merits hearings, in compliance with their ethical obligations. Because these attorneys cannot adequately prepare, and in some cases will be forced to withdraw from the representation, the Policy plainly interferes with Somali noncitizens' ability to meaningfully exercise their right to the counsel of their choice in these proceedings. And because the Policy is broadly affecting immigration attorneys, many of these noncitizens will be left with no counsel at all.

76. Second, the INA guarantees noncitizens "a reasonable opportunity to examine the evidence against [them], to present evidence on [their] own behalf, and to cross-examine witnesses presented by the Government." 8 U.S.C. § 1229a(b)(4)(B), *see also Matter of R-C-R-*, 28 I. & N. Dec. 74, 77 (BIA 2020) (a noncitizen "who faces removal is entitled to a full and fair removal hearing under" the INA). Attorneys whose cases have been placed on this new docket no longer have capacity to fully prepare to represent their clients at individual merits hearings. The noncitizens whom they represent therefore do not have anything close to a reasonable opportunity to examine and present evidence or to cross-examine witnesses. The Policy deprives these noncitizens of the ability to have their claims fairly considered as the INA requires.

19

77. Third, the INA guarantees noncitizens an impartial adjudicator to preside over removal hearings and decide cases based on case-specific evidence. 8 U.S.C. § 1229a(c)(1)(A) ("The determination of the immigration judge shall be based only on the evidence produced at the hearing."). The INA necessarily incorporates the impartial adjudicator guarantee embodied in the Due Process Clause of the Fifth Amendment. *See Las Ams. Immigrant Advoc. Ctr. v. Trump*, 475 F. Supp. 3d 1194, 1214 (D. Or. 2020) (judicial bias inquiry "extends to any procedure that could offer a 'possible temptation' to the average judge to [forgo] the proper burden of proof" (quoting *Echavarria v. Filson*, 896 F.3d 1118, 1131 (9th Cir. 2018))). The Policy contravenes that guarantee because it assigns hearings for non-detained Somali nationals to out-of-venue IJs, many of whom deny asylum relief at rates higher than the national average. By depriving noncitizens of effective counsel, moreover, the Policy pushes IJs toward a preordained outcome and places a thumb on the scale against relief. The Policy thus creates a constitutionally and statutorily intolerable probability of actual bias.

78. The Policy is also "contrary to constitutional right" because it runs afoul of Plaintiffs' and their clients' Fifth Amendment due process and equal protection rights, as well as Plaintiffs' First Amendment rights. *See infra* Counts III, IV, and V.

## COUNT II
## Violation of the APA, 5 U.S.C. § 706(2)(A) – Arbitrary & Capricious
## (All Plaintiffs)

79. The paragraphs above are incorporated and reasserted as if fully set forth here.

80. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

81. The Somali Fast-Track Policy is arbitrary and capricious for several reasons.

82. First, Defendants failed to consider several "important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants did not

20

consider the impact of accelerating hearings on noncitizens in removal proceedings and the attorneys and organizations seeking to assist them. They also failed to consider the statutory and due process rights of noncitizens in removal proceedings, including the right to counsel. Nor did they consider the impact the Policy would have on legal service providers, who are now faced with the prospect of withdrawing from cases—leaving their clients unrepresented in these complex proceedings—because the Policy makes it nearly impossible for them to comply with their ethical obligations. Many of their clients will be left unrepresented and will be hard-pressed to obtain relief on their own even in meritorious cases, meaning that more erroneous removals of individuals entitled to relief will occur. The Policy utterly fails to grapple with any of these flaws, rendering it arbitrary and capricious.

83. Second, Defendants substantially changed policies without adequate explanation. Previously, non-detained Somali immigrants requesting relief from removal went through the same process as everyone else: their cases were heard by IJs within their jurisdiction, and their attorneys had a reasonable amount of time to prepare for the complexities of a merits hearing. In fact, EOIR's own guidance emphasized the importance of adequate preparation time for attorneys. Defendants have now changed course, however, creating a fast-track docket that singles out Somalis and expedites their cases to an unprecedented degree. Defendants' failure to reasonably explain or even acknowledge this change in policy is arbitrary and capricious. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

84. Third, Defendants failed to consider weighty and longstanding reliance interests. Specifically, Defendants failed to consider the reliance interests of immigration-focused law firms, like Plaintiff Hines Immigration Law, who carefully design and manage their dockets to ensure they have adequate time to give each case the extensive preparation it requires, in compliance with ethical obligations. In doing so, those firms and their lawyers reasonably expected the relatively

predictable timeframe for merits hearings to continue. Noncitizens in removal proceedings also relied on the understanding that they would be entitled to the counsel of their choice—and that their attorneys would not suddenly be deluged with unreasonable hearing schedules and unable to competently assist them. Nor did Defendants consider the reliance interests of other organizations, like Plaintiff AHR, whose work has been thrown into chaos by the new Policy. This complete disregard for reliance interests renders the Policy arbitrary and capricious. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30–31, 33 (2020).

85. Fourth, Defendants gave no apparent consideration to any reasonable alternatives to the Policy. *See Spirit Airlines, Inc. v. U.S. Dep't of Transp. & Fed. Aviation Admin.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021).

86. Fifth, the Policy fails to acknowledge—let alone consider—the Fifth Amendment's Due Process Clause, the First Amendment, and the rights of noncitizens and their attorneys in removal proceedings impacted by the Policy.

87. Finally, Defendants failed to consider their own regulations and guidance, which emphasize the importance of the right to counsel in removal proceedings, *see, e.g.*, 8 C.F.R. § 1240.10(a); *id.* § 1003.102; PM 21-13, at 5, and highlight the discretion of immigration judges, *see, e.g.*, 8 C.F.R. § 1003.9; PM 25-42, at 2; PM 25-47, at 3.

88. For these reasons, and many others, the Somali Fast-Track Policy is arbitrary and capricious.

**COUNT III**
**Violation of U.S. Constitution – Fifth Amendment Due Process Clause**
**(All Plaintiffs)**

89. The paragraphs above are incorporated and reasserted as if fully set forth here.

90. "'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)).

91. That means "'no person shall be' removed from the United States 'without opportunity, at some time, to be heard'" in a meaningful way. *A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025) (quoting *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903)). "One way [courts] ensure that the 'standards of fairness' are met is by guaranteeing that [noncitizens] have the opportunity to be represented by counsel." *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005).

92. The Somali Fast-Track Policy violates the Due Process Clause because its fast-tracking of immigration proceedings for Somalis gravely threatens their attorneys' ability to fulfill their ethical obligations to competently and diligently represent each client. Attorneys do not have anywhere near the time they need to prepare for merits hearings in cases that have been placed on this new, Somali-only "rocket docket." The Policy thus deprives noncitizens of the ability to meaningfully exercise their Fifth Amendment right to counsel or have their claims fairly considered in a full proceeding before an impartial adjudicator.

93. The Policy also interferes with due process interests that attorneys and clients have in their contractual and professional relationships. Attorneys have already been forced to stop accepting new clients, and they will be forced to withdraw from upcoming merits hearings because the Policy effectively prevents them from putting in the preparation time required to comply with their ethical obligations. As a result, some Somali noncitizens will have to go without their chosen counsel in complex proceedings with literal life-and-death stakes.

## COUNT IV
### Violation of U.S. Constitution – Fifth Amendment Due Process Clause – Equal Protection
### (All Plaintiffs)

94. The paragraphs above are incorporated and reasserted as if fully set forth here.

23

95. The Fifth Amendment contains an implicit guarantee of equal protection that invalidates any official action that in part reflects a racially discriminatory intent or purpose. Classifications based on race, ethnicity, or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

96. The Somali Fast-Track Policy is unconstitutional because it intentionally discriminates based on race, ethnicity, or national origin.

### COUNT V
### Violation of U.S. Constitution – First Amendment – Free Speech and Association
### (All Plaintiffs)

97. The paragraphs above are incorporated and reasserted as if fully set forth here.

98. The First Amendment to the United States Constitution guarantees attorneys the rights of free association and speech, which each include the right to provide representation to individuals who wish to retain their services—including the ability to communicate and consult with those individuals. The government may not unreasonably restrict those rights.

99. That right also encompasses the rights of attorneys to provide legal advice to clients and to make effectively crafted legal arguments on their behalf. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001); *In re Primus*, 436 U.S. 412 (1978).

100. By unreasonably interfering with and/or entirely preventing Plaintiffs from effectively advising their non-detained Somali clients and other Somali nationals who wish to retain their services, Defendants have violated and continue to violate Plaintiffs' and their attorneys' rights under the First Amendment.

101. By unreasonably interfering with and/or entirely preventing non-detained Somali nationals in removal proceedings from contacting, retaining, consulting, and communicating with

24

counsel, including Plaintiffs and their attorneys, Defendants have violated and continue to violate Plaintiffs' and their attorneys' rights under the First Amendment.

102. Plaintiffs and their clients have suffered and will continue to suffer irreparable injury as a result of Defendants' violation of their First Amendment rights.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

a. Issue a stay under 5 U.S.C. § 705 of the Policy;

b. Preliminarily and/or permanently enjoin Defendants from enforcing the Policy;

c. Hold unlawful, vacate, and/or set aside the Policy under 5 U.S.C. § 706;

d. Declare that the Policy is unlawful under the APA, the INA, the Fifth Amendment's Due Process Clause, and the First Amendment;

e. Award Plaintiffs their costs, reasonable attorney fees, and other disbursements deemed appropriate; and

f. Grant such other relief as the Court deems necessary, just, and proper.

Date: March 24, 2026

Respectfully submitted,

*/s/ Jyoti Jasrasaria*
Jyoti Jasrasaria (D.C. Bar No. 1671527)
Michael J. Torcello (D.C. Bar No. 90014480)
Yenisey Rodríguez (D.C. Bar No. 1600574)
Robin F. Thurston (D.C. Bar No. 1531399)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
jjasrasaria@democracyforward.org
mtorcello@democracyforward.org
yenisey.rodriguez@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*

25
