**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **HINES IMMIGRATION LAW, PLLC**, et al.,<br><br>       *Plaintiffs,*<br><br>v.<br><br>**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**, et al.,<br><br>       *Defendants.* | **Case No. 26-cv-1018** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION
FOR A STAY UNDER 5 U.S.C. § 705**

**TABLE OF CONTENTS**

Introduction.................................................................................................................. 1

Background .................................................................................................................. 2

    I.   The Constitution and federal law enshrine procedural protections for noncitizens in immigration proceedings. ................................................................................. 2

    II.  Immigration judges conduct removal proceedings in which the right to counsel plays a critical role. .................................................................................................. 4

    III. Immigration judges have broad discretion to conduct the proceedings before them. ......... 7

    IV. Defendants eliminate immigration judges' discretion and eviscerate noncitizens' right to a fair process by fast-tracking non-detained Somali immigration proceedings. ............. 8

    V.  The Somali Fast-Track Policy irreparably harms Plaintiffs. ............................................. 17

Legal Standard ............................................................................................................ 21

Argument .................................................................................................................... 21

    I.   Plaintiffs are likely to show that the Somali Fast-Track Policy violates the APA............. 22

        A.   The Somali Fast-Track Policy is final agency action. ................................................. 22

        B.   The Somali Fast-Track Policy is contrary to law.......................................................... 25

        C.   The Somali Fast-Track Policy is arbitrary and capricious........................................... 28

    II.  Plaintiffs face irreparable harm absent emergency relief. ................................................. 32

    III. The balance of the equities and the public interest favor Plaintiffs.................................. 36

Conclusion .................................................................................................................. 37

**INTRODUCTION**

This suit challenges Defendants' unlawful decision to single out and fast-track the immigration proceedings of non-detained Somalis on a dedicated national docket before a handpicked subset of immigration judges (IJs). Defendants' "Somali Fast-Track Policy" marks an abrupt departure from the longstanding status quo for scheduling and conducting these proceedings. And it follows months of vitriol from President Trump targeting Somalis, including referring to them as "garbage" and declaring: "I don't want them in our country. I'll be honest with you. . . . Their country stinks."[1]

The Policy makes it far more difficult—and in some cases, nearly impossible—for immigration attorneys to effectively represent their non-detained Somali clients. Under the Policy, initial hearings have been scheduled en masse, creating irreconcilable scheduling conflicts for lawyers and forcing them to miss some hearings at the expense of others. Perhaps even worse, Somali nationals' final merits hearings—the last chance to make their case for humanitarian protection before the IJ—have been rapidly advanced under the new Policy, leaving attorneys with mere days or weeks to assemble evidence and prepare arguments instead of the six months or more that is typical. As if that were not enough of a thumb on the scale in favor of removal, these newly expedited hearings have been assigned to a subset of IJs who sit outside the noncitizen's venue and tend to have higher-than-average removal rates. Defendants have imposed this Policy even though their own laws, guidance, and regulations—not to mention the U.S. Constitution—acknowledge the right to counsel and the importance of effective preparation in such proceedings.

The Somali Fast-Track Policy violates the Administrative Procedure Act (APA) and requires an emergency stay. First, the Policy is contrary to law because it eviscerates multiple

---

[1] *WATCH: Trump says he doesn't want Somali migrants in the U.S., calls people 'garbage,'* PBS News (Dec. 2, 2025), https://perma.cc/6VHQ-Q62A.

statutory requirements, enshrined in the Immigration and Nationality Act (INA), that protect the rights of noncitizens. Second, the Policy is arbitrary and capricious because Defendants have no reasoned basis to deprive Somali nationals of a fair proceeding, and they failed to address multiple important aspects of the problem—including the Policy's fundamental due process defects and their own regulations and guidance, failed to account for weighty and longstanding reliance interests, and failed to consider reasonable alternatives to the Policy.

Because Plaintiffs face irreparable harm absent a stay, are likely to succeed on the merits of their APA claims, and satisfy the other criteria for preliminary relief, this Court should stay the Policy under 5 U.S.C. § 705. Although Plaintiffs are already experiencing irreparable harm from this Policy, Plaintiff Hines Immigration Law's first individual merits hearing under the Policy is scheduled for April 1, 2026, with several others following it closely. Given the stakes of these merits hearings, and the irreparable harm Plaintiffs and their clients will suffer if the Policy remains in effect on that date, Plaintiffs respectfully request a ruling by March 31, 2026.

## BACKGROUND

**I.    The Constitution and federal law enshrine procedural protections for noncitizens in immigration proceedings.**

Immigration proceedings are notoriously complex. They also carry enormous stakes, often involving matters of life or death. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) ("[D]eportation is a particularly severe 'penalty.'" (citation omitted)). That is especially true in asylum cases, where noncitizens face the threat of persecution, torture, or death if removed. Declaration of Kelsey Hines ("Hines Decl.") ¶¶ 112–17; *cf. Nken v. Holder*, 556 U.S. 418, 436 (2009) ("Of course there is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").

2

In the face of these complexities, the Constitution and federal law guarantee certain basic protections. For one, the Due Process Clause of the Fifth Amendment and the INA require full and fair proceedings for noncitizens facing removal. *See, e.g.*, *Rosales v. ICE*, 426 F.3d 733, 736 (5th Cir. 2005) ("[D]ue process requires that [deportation] hearings be fundamentally fair." (citation omitted)); *see also Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005); *Borges v. Gonzales*, 402 F.3d 398, 408 (3d Cir. 2005). To that end, the INA provides that noncitizens in removal proceedings shall have "a reasonable opportunity to examine the evidence," an opportunity "to present evidence," and an option "to cross-examine witnesses presented by the Government." 8 U.S.C. § 1229a(b)(4)(B); *see also* 8 C.F.R. § 1240.10(a)(4) (requiring IJ to "[a]dvise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him or her, to present evidence in his or her own behalf and to cross-examine witnesses presented by the government").

Under the INA, moreover, noncitizens are entitled to legal representation of their own "choosing," but "at no expense to the Government." 8 U.S.C. §§ 1229a(b)(4)(A), 1362. The INA repeatedly emphasizes the importance of legal representation in immigration proceedings. *See*, *e.g., id.* § 1158(d)(4)(A)–(B) (requiring the government to advise asylum applicants "of the privilege of being represented by counsel" and to provide them with an updated list of people "who have indicated their availability to represent [noncitizens] in asylum proceedings on a pro bono basis"); *id.* § 1229(a)(1)(E) (providing that noncitizens "may" be represented by counsel and that they "will be provided (i) a period of time to secure counsel under subsection (b)(1) and (ii) a current list of counsel prepared under subsection (b)(2)"); *id.* § 1229(b)(2) (requiring the government to provide lists to noncitizens of pro bono legal services providers); *id.* § 1228(a)(2) (requiring that, in the case of noncitizens facing removal based on certain convictions, "the

3

Attorney General shall make reasonable efforts to ensure that the [noncitizen's] access to counsel and right to counsel under section 1362 of this title are not impaired"). The same is true of Executive Office for Immigration Review (EOIR) regulations, which provide that the IJ in a removal proceeding shall "[a]dvise the respondent of his or her right to representation, at no expense to the government, by counsel of his or her own choice authorized to practice in the proceedings." 8 C.F.R. § 1240.10(a)(1).

## II. Immigration judges conduct removal proceedings in which the right to counsel plays a critical role.

When the Department of Homeland Security (DHS) wishes to remove a noncitizen, it generally must obtain an order of removal from an immigration judge, who conducts proceedings and finds facts before granting relief or ordering removal. *See* 8 U.S.C. §§ 1229a(a)(1), (c)(1)(A). In the ordinary course, the IJ who conducts these proceedings sits in the venue where the noncitizen is located. Hines Decl. ¶ 32.

A noncitizen typically appears before an IJ for two types of hearings—master calendar hearings and individual merits hearings. Master calendar hearings are generally procedural: the IJ explains the noncitizen's rights, the charges against them, and the nature of the proceedings. *See* 8 C.F.R. § 1240.10(a)(1)–(7). If the noncitizen is unrepresented, the IJ must provide a list of free or low-cost legal service providers and give the noncitizen an opportunity to find counsel. *See id.* § 1240.10(a)(1)–(2); *id.* § 1003.16; 8 U.S.C. § 1229a(b)(4)(A). Noncitizens may request a continuance of their master calendar hearing if they would like more time to speak to an attorney, prepare an application for relief, or otherwise think about how to proceed with their case. 8 C.F.R. § 1003.29; *id.* § 1240.6. If the noncitizen is already represented, and the attorney has submitted written pleadings, the master calendar hearing is typically vacated. *See* EOIR Policy Manual, Part II § 2.1(b)(1)(B), https://www.justice.gov/eoir/policy-manual-eoir (last visited Mar. 24, 2026);

4

Hines Decl. ¶¶ 17–18. The case is then placed in a queue to be set for an individual merits hearing. Hines Decl. ¶ 18; Declaration of Robin Carr ("Carr Decl.") ¶ 6; Declaration of Evangeline Dhawan-Maloney ("Dhawan-Maloney Decl.") ¶ 4.

The IJ must hold an individual merits hearing if the noncitizen has applied for relief from removal, including in the form of asylum. 8 C.F.R. § 1240.11. Noncitizens who are represented and not detained generally must submit supporting documents at least 30 days in advance of the merits hearing. EOIR Policy Manual, Part II § 2.1(b)(2)(B). At the merits hearing, the noncitizen must have the opportunity to testify, examine witnesses, and present evidence. 8 U.S.C. § 1229a(b)(4)(B); 8 C.F.R. § 1240.10(d). The IJ then decides whether to grant or deny the application for relief. 8 C.F.R. § 1240.12; *id.* § 1003.37.

The merits hearing is crucial to a noncitizen's case and requires extensive preparation by their attorney. Hines Decl. ¶¶ 23–30. For example, Kelsey Hines—owner and managing attorney of Plaintiff Hines Immigration Law, PLLC ("the Hines Firm")—spends on average at least 150 hours preparing for each merits hearing. Hines Decl. ¶ 30. Consistent with that need for preparation time, a merits hearing in a non-detained case is almost always set with at least six months' notice, and usually more. *E.g.*, Declaration of Alexis Dutt ("Dutt Decl.") ¶ 5; Dhawan-Maloney Decl. ¶ 4. As EOIR guidance explains, "the time between a master calendar hearing and an individual merits hearing, which often exceeds one year in a non-detained case, already encompasses substantial time for preparation." Policy Memorandum 21-13 from James R. McHenry III, Director of EOIR, at 5 (Jan. 8, 2021), https://perma.cc/N93N-LEG9 (hereinafter "PM 21-13"); *see also Matter of J-A-F-S-*, 29 I. & N. Dec. 195, 197 (BIA 2025) ("Individual hearings for non-detained cases are frequently scheduled far in advance due to the Immigration Courts' extremely high caseloads.").

5

In fact, EOIR regulations and guidance make clear that adequate preparation for these matters is essential. Attorneys may face sanctions if they do not provide competent representation, which "requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." 8 C.F.R. § 1003.102(o). Attorneys must "[r]easonably consult with the client about the means by which the client's objectives are to be accomplished," including by "meet[ing] with the client sufficiently in advance of a hearing or other matter to ensure adequate preparation of the client's case." *Id.* § 1003.102(r)(2). Accordingly, an attorney's "workload must be controlled and managed so that each matter can be handled competently." *Id.* § 1003.102(q)(1). Sanctions may be imposed on an attorney "who takes on more cases than he or she can responsibly and professionally handle." PM 21-13, at 5.

Like other attorneys, Ms. Hines's practice is to complete most of her preparation after the merits hearing date is set. Hines Decl. ¶ 21; *see also* Carr Decl. ¶ 18 ("Country conditions evidence must be current and therefore must be obtained at the time of adjudication, not at the time of the initial filing."). Otherwise, the work she must undertake before a hearing—which includes finalizing reports about conditions in the noncitizen's home country, referring and obtaining a psychological evaluation, and conducting legal research in a field that can change week-to-week— would be out-of-date by the time the merits hearing arrived. Hines Decl. ¶¶ 22–28. Ultimately, these extensive efforts are well worth it for Ms. Hines and her clients: noncitizens with counsel have a significantly higher chance of obtaining relief in these complex proceedings. Hines Decl. ¶¶ 29, 120; Declaration of Hanne Sandison ("Sandison Decl.") ¶ 15; *see also* Ingrid Eagly & Steven Shafer, Am. Immigr. Council, *Access to Counsel in Immigration Court*, at 2–3 (Sep. 2016), https://perma.cc/2N67-528M (finding that immigrants with attorneys fared better at every stage of

the process and were nearly five times more likely than their unrepresented counterparts to obtain relief).

**III. Immigration judges have broad discretion to conduct the proceedings before them.**

Immigration judges are supposed to have broad discretion to manage their docket and ensure that each noncitizen receives a full and fair proceeding. EOIR regulations mandate that, in deciding cases, IJs "shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the Act and regulations that is necessary or appropriate for the disposition or alternative resolution of such cases." 8 C.F.R. § 1003.10(b). EOIR guidance also makes clear that "all adjudicators at EOIR are independent in their decision-making in the cases before them." Policy Memorandum 25-42 from Sirce E. Owen, Acting Dir. of EOIR, at 1 (Aug. 22, 2025), https://perma.cc/HT47-6XSN (hereinafter "PM 25-42"). Accordingly, "no EOIR employee or officer can direct any adjudicator to rule in a particular way on a matter before him or her in the first instance." *Id.* at 2.

The Office of the Chief Immigration Judge is responsible "for the supervision, direction, and scheduling of the immigration judges in the conduct of the hearings and duties assigned to them." 8 C.F.R. § 1003.9(b). But the Chief Immigration Judge "shall have no authority to direct the result of an adjudication assigned to another immigration judge." *Id.* § 1003.9(c). And "the designation of a case as a priority is not intended to limit the discretion afforded an Immigration Judge under applicable law, nor is it intended to mandate or direct a specific outcome in any particular case." Policy Memorandum 25-47 from Sirce E. Owen, Acting Dir. of EOIR, at 3 (Sep. 12, 2025), https://perma.cc/95ML-C966 (hereinafter "PM 25-47").

**IV. Defendants eliminate immigration judges' discretion and eviscerate noncitizens' right to a fair process by fast-tracking non-detained Somali immigration proceedings.**

Of the 3.3 million pending cases in immigration court, about 3,200 involve Somali nationals. *Immigration Court Backlog*, Transactional Records Access Clearinghouse, https://tracreports.org/phptools/immigration/backlog (for "Immigration Court State," select "All-2026"; for "Nationality," select "Somalia") (last visited Mar. 24, 2026). About 2,700 of those cases involve non-detained Somali nationals. *Id.* (for "Custody," select "Never Detained"). Around half of both detained and non-detained Somali cases are out of Minnesota, but there are also more than a hundred such cases in each of Washington, Ohio, Illinois, and California, and several in other jurisdictions. *Id.*

In late January 2026, Defendants abruptly departed from the prevailing framework in these immigration proceedings for non-detained Somali nationals. *E.g.*, Declaration of Matthew Raymond Mockenhaupt ("Mockenhaupt Decl.") ¶ 5; Declaration of Imelda Maynard ("Maynard Decl.") ¶ 9. Specifically, Defendants have adopted and begun implementing a policy to rapidly set or advance immigration hearing dates—both master calendar and merits hearings—for Somalis. This Somali Fast-Track Policy has not been publicly promulgated, but its existence is evident from Defendants' actions, IJs' statements, and the common experiences of numerous attorneys who practice in this field. Under the Policy, Somali immigration cases are resolved on a dedicated nationalized docket, before a small subset of IJs, on a highly accelerated timeline. While this Policy has had an outsized impact in Minnesota due to the state's large Somali population, *e.g.*, Hines Decl. ¶ 37; Mockenhaupt Decl. ¶¶ 5, 9, it is being implemented across the nation, *e.g.*, Maynard Decl. ¶ 9 (Texas); Declaration of Adam Boyd ("Boyd Decl.") ¶¶ 4–6 (Washington State); Declaration of Caroline Fuchs ("Fuchs Decl.") ¶ 4 (Wisconsin); Declaration of Jacquelyn M. Kline

("Kline Decl.") ¶ 5 (Pennsylvania); Declaration of Lisa Pickering ("Pickering Decl.") ¶¶ 5–6 (California).[2]

As is evident from more than a dozen declarations submitted in support of this motion, the Policy has three central features: (1) master calendar hearings are scheduled for non-detained Somali immigration cases in which such hearings were previously vacated and are otherwise unnecessary; (2) individual merits hearings in these cases are set and advanced on short notice for no later than summer 2026, providing minimal time for counsel to prepare; and (3) all or nearly all these hearings are assigned to a subset of IJs who sit outside the Somali noncitizen's venue and often have higher-than-average removal rates. All these features are highly unusual and represent a sudden departure from the status quo in immigration proceedings.

First, pursuant to the Policy, IJs have abruptly reset Somali proceedings for master calendar hearings. Boyd Decl. ¶ 5; Dhawan-Maloney Decl. ¶ 5. They have provided as little as one or two weeks' notice. Maynard Decl. ¶ 9; Fuchs Decl. ¶ 4; Declaration of Abdiqani A. Jabane ("Jabane Decl.") ¶ 2; Declaration of Hannah Brown ("Brown Decl.") ¶ 5; Declaration of Nysha Operana ("Operana Decl.") ¶ 5; Declaration of Rachel Michelle Petersen ("Petersen Decl.") ¶ 10. The IJs have done so even in cases where there is no need for such a hearing because the noncitizen has already submitted written pleadings and has been placed in the scheduling queue for a merits hearing. Hines Decl. ¶¶ 38, 41; *see also* EOIR Policy Manual, Part II § 2.1(b)(1)(B). In some instances, several hearings have been scheduled within the same time block. Jabane Decl. ¶ 3 (attorney represented eight Somali clients whose cases were scheduled within same 30-minute

---

[2] *See also, e.g.*, Ximena Bustillo, *Immigration Courts Fast-Track Hearings for Somali Asylum Claims*, NPR (Feb. 9, 2026), https://perma.cc/M2J6-39RB (noting affected cases in Minnesota, Illinois, and Nebraska); Francia Garcia Hernandez, *Immigration Judge Fast-Tracks Asylum Hearings for Local Somali Asylum-Seekers*, Block Club Chicago (Feb. 18, 2026), https://perma.cc/YZ92-YMQH.

block); Declaration of Steven C. Thal ("Thal Decl.") ¶ 10 (IJ resorted to "mass hearing" on one date without taking individual appearances).

This practice has flooded the dockets of immigration attorneys with master calendar hearings. Ms. Hines, for example, has had 71 Somali master calendar hearings scheduled for between February 17 and July 31, 2026—with some even scheduled for the same time slot on the same day. Hines Decl. ¶¶ 47–48, 80. While this scheduling approach is a stark departure from the past, Ms. Hines's experience is not unique. Carr Decl. ¶ 11 (attorney has had approximately 26 master calendar hearings scheduled for between late March and late July 2026); Boyd Decl. ¶ 5 (firm has had to handle as many as 11 Somali master calendar hearings in one day); Mockenhaupt Decl. ¶ 5 (attorney has received at least 70 Somali master calendar hearing notices since late January 2026); Thal Decl. ¶ 10 (attorney had 23 Somali master calendar hearings in one week); Declaration of Lauren Lowry ("Lowry Decl.") ¶ 4 (attorney had 80% of Somali cases scheduled for master or merits hearings between February and July 2026). These newly scheduled hearings have upended the ability of immigration attorneys—who carefully curated their dockets to remain manageable under the usual framework for these proceedings—to provide effective counsel to their clients. Hines Decl. ¶¶ 13, 20, 124.

Second, the Policy has required IJs to rapidly advance individual merits hearings. Many attorneys have seen their dockets explode with merits hearings in Somali cases. Hines Decl. ¶ 81 (attorney has 39 Somali merits hearings scheduled between April 1 and July 31, 2026); Carr Decl. ¶¶ 11–12 (attorney has more than 70 Somali merits hearings scheduled between late March and late July 2026, including 20 in June alone); Mockenhaupt Decl. ¶¶ 9–10 (in last month, attorney has been scheduled for about 50 Somali merits hearings from mid-April to July 2026); Boyd Decl.

10

¶ 9 (firm has had "many" Somali merits hearings scheduled for May through July 2026); Thal Decl. ¶¶ 12–14 (attorney has 30 Somali merits hearings scheduled from April through June 2026).

In the usual course, as noted above, attorneys would have at least six months—and typically more than a year—to prepare for a merits hearing. Boyd Decl. ¶ 10 (merits hearings usually noticed "at least a year, if not two to three years, in advance"); Dhawan-Maloney Decl. ¶ 4; Dutt Decl. ¶ 5; *see also* Carr Decl. ¶ 5 (before adoption of Policy, attorney had 12 to 14 merits hearings set for 2026, "which reflected a typical and manageable caseload"). Now, however, merits hearings in non-detained Somali cases have been scheduled or advanced with as little as thirty days' notice. Lowry Decl. ¶ 5 (noting need to prepare for merits hearings "in a matter of weeks"); Kline Decl. ¶ 7; Dhawan-Maloney Decl. ¶ 7; Pickering Decl. ¶ 7; Operana Decl. ¶ 8. This too is highly unusual. Boyd Decl. ¶ 10 (attorney has "never seen such short timelines to prepare"); Petersen Decl. ¶ 7 (merits hearings are often scheduled "over a year in advance"); Jabane Decl. ¶ 2 (Somali merits hearings have been scheduled with "comparatively short preparation timelines"). And this aspect of the Policy is especially destructive because of the importance of supporting documents, which typically must be submitted no later than thirty days before the merits hearing. Kline Decl. ¶¶ 17, 19–20 (clients are "struggling to produce supporting documents . . . with such short notice," especially where they must schedule medical evaluations or gather evidence from outside the United States); Carr Decl. ¶ 18 ("[p]reparation of Somali asylum cases is particularly time-intensive"); Operana Decl. ¶ 9 (effective representation requires "a minimum of six months of preparation" for merits hearing). If a merits hearing is scheduled thirty-five days' out, for example, that means the attorney now has only five days to submit supporting documents—which can include thousands of pages, require translation, and involve hard to collect or specialized evidence such as identity and family documents, affidavits from

11

people living abroad, current country conditions reports, and expert materials. Carr Decl. ¶ 18; Hines Decl. ¶¶ 21–28, 57, 70. In some cases, moreover, the merits hearings are being scheduled for unusually short windows. Kline Decl. ¶¶ 11, 14 (noting several merits hearings scheduled for 30 minutes each and explaining "[t]here is no way that a full merits hearing can be conducted in a 30-minute time slot"); Declaration of Elizabeth M. Streefland ("Streefland Decl.") ¶ 12; Hines Decl. ¶¶ 75–76. Ms. Hines even had two Somali clients scheduled for merits hearings in the same 90-minute time slot, on the same day, before the same IJ, which she attests "has never happened to me or any lawyer I know during the entirety of the time I have been practicing law." Hines Decl. ¶ 57.

This practice, again, has thrown immigration attorneys' dockets into chaos. Ms. Hines has several weeks with four or five merits hearings scheduled and multiple days with two merits hearings scheduled, which is "unheard of." Hines Decl. ¶ 63. She attests that, under the new Policy, it will be nearly impossible for her to devote the time required to prepare for these complex proceedings. Hines Decl. ¶¶ 59, 78–82. The same is true for other attorneys who regularly represent non-detained Somali nationals in immigration court. Fuchs Decl. ¶ 13 ("Expedited proceedings make it almost impossible to provide the amount of evidence necessary to sustain a case."); Kline Decl. ¶¶ 15–16 (advancement of merits hearings on short notice "has put extreme and undue stress not only on my clients but myself and my staff as well," and has made it more difficult to find an available interpreter); Streefland Decl. ¶ 11 ("It has been a scramble to find expert witnesses because the few available experts are being flooded with requests to do work in a compressed timeline."); Dhawan-Maloney Decl. ¶ 12 (discussing fear "that I will have to withdraw from cases since I will be unable to adequately prepare for these rapid individual hearings that could now be scheduled"); Mockenhaupt Decl. ¶ 9 (ability to provide adequate

12

representation is "hindered" by vast number of merits hearings scheduled within short time); Operana Decl. ¶ 11 (this fast-tracking "forces attorneys to triage critical aspects of case preparation, increasing the risk of incomplete records, insufficient corroboration, and errors in testimony"); Petersen Decl. ¶¶ 16, 19–20 (expediting several cases for merits hearings is "disruptive," creates substantial logistical issues, and is "pretty much unprecedented"); Dutt Decl. ¶ 9 (attorneys are being scheduled "for anywhere from 1 to 3 individual hearings in one day").

IJs handling these Somali cases have also routinely denied or ignored requests to continue hearings. Fuchs Decl. ¶ 5; Streefland Decl. ¶ 8. Attorneys have requested continuances when, for example, they have unavoidable scheduling conflicts, such as another hearing at the same time on the same day before a different IJ. Hines Decl. ¶ 49. IJs nonetheless have refused to grant continuances, have granted only trivial continuances of mere days, or have simply vacated the master calendar hearing and proceeded directly to an individual merits hearing on an expedited timetable. Hines Decl. ¶¶ 50–52, 55–56; Mockenhaupt Decl. ¶ 9.[3]

In setting individual merits hearings, moreover, IJs have stated without elaboration that their "expedited" calendars available for scheduling "only go out" to a certain date—typically in June or July—and that they are unable to schedule beyond that date. Hines Decl. ¶¶ 58, 60–62; *see also* Streefland Decl. ¶ 9; Mockenhaupt Decl. ¶ 7; Dutt Decl. ¶ 9. In the past, IJs have scheduled hearings for up to two or three years out, with no indication that their calendars could not "go out"

---

[3] DHS—the prosecuting agency—has not moved to expedite these hearings, Hines Decl. ¶¶ 41–43, and DHS representatives have stated, "It doesn't matter if [the hearing] is advanced or not," Hines Decl. ¶ 44 (alteration in original). Instead, IJs have expedited these hearings sua sponte, Hines Decl. ¶ 41, even though EOIR guidance provides that "[i]f a party believes that a master calendar hearing is necessary where a hearing has been vacated or none has been scheduled, the party must make a written motion for master calendar hearing." EOIR Policy Manual, Part II § 2.1(c)(5); *see also* Hines Decl. ¶ 41 ("In my career, I have never had a master calendar hearing scheduled or advanced, or an individual calendar hearing advanced, by the immigration court without motion by either party.").

13

that far. Hines Decl. ¶ 61; *see also* Streefland Decl. ¶ 9 (until recent hearing, "I had never had a judge tell me they could not schedule[] a hearing later than a certain time period."). IJs have made clear that resolving cases on "this docket"—apparently referring to the docket of Somali nationals—is a "priority," that "[they]'ve got to hear all of them," that "we're all going to have to deal with this docket one way or the other," and that they have "limited options" to "accommodate counsel" when scheduling hearings. Hines Decl. ¶¶ 58, 64, 68; Mockenhaupt Decl. ¶ 7; *see also* Dutt Decl. ¶ 10 (IJ stated that "they had been asked to 'help out' on these cases and assigned these Somali dockets" and that "these cases would take priority"). Several IJs have told counsel, in response to questions about why they cannot schedule hearings past a certain date, that their "hands are tied" because the cases have been pending for a long time—even though similarly long-pending cases for noncitizens of other nationalities have not been expedited. Mockenhaupt Decl. ¶ 8. IJs have also advised counsel to raise any scheduling concerns with the "powers that be." Hines Decl. ¶ 58. Indeed, one immigration court clerk informed an attorney that the merits hearings for her non-detained Somali clients "had been scheduled by Headquarters, not by the Philadelphia Immigration Court itself." Kline Decl. ¶ 11.

Third, all or nearly all hearings for non-detained Somali nationals—including those that were previously assigned to other IJs—have been scheduled with a small subset of IJs, including Chief IJ Teresa Riley (who sits in Cleveland, OH), Assistant Chief IJ Sherron Ashworth (Oakdale, LA), Assistant Chief IJ Craig Defoe (Chicago, IL), Assistant Chief IJ Kevin Riley (Los Angeles, CA), IJ Chris Brisack (Conroe, TX), IJ Andrew Caborn (Conroe, TX), IJ Nina Carbone (Denver, CO), IJ Guy Grande (San Diego, CA), IJ Philip Taylor (Atlanta, GA), and IJ Abdias Tida (El Paso, TX). Mockenhaupt Decl. ¶ 6; Maynard Decl. ¶ 9; Boyd Decl. ¶ 6; Fuchs Decl. ¶¶ 6, 9; Brown Decl. ¶ 5; Streefland Decl. ¶ 4; Pickering Decl. ¶ 6; Operana Decl. ¶ 6; Thal Decl. ¶ 16; Hines

14

Decl. ¶¶ 60, 62, 64, 66. Many of these IJs have substantially higher removal rates and lower asylum grant rates compared to the national average. *See Judge-by-Judge Asylum Decisions in Immigration Courts FY 2020-2025*, Transactional Records Access Clearinghouse (Nov. 7, 2025), https://perma.cc/YSH3-X4PG; *Judge Profiles*, Mobile Pathways, https://perma.cc/UM3X-8838 (use "Select a Judge" dropdown menu) (last visited Mar. 24, 2026).

These IJs appear to be exclusively hearing Somali cases—even though those cases represent just a fraction of the overall immigration court docket. Maynard Decl. ¶ 11; Boyd Decl. ¶ 8; Brown Decl. ¶ 7; Pickering Decl. ¶ 8. It is highly irregular for IJs to be hearing cases involving immigrants of just one nationality. Maynard Decl. ¶ 17; Boyd Decl. ¶ 16; Pickering Decl. ¶ 10. The IJs have frequently scheduled multiple hearings for the same day and time slot. Brown Decl. ¶ 7. And they have allotted shorter periods for hearings than is typical. Boyd Decl. ¶ 13 (merits hearing scheduled for just 30-minute window).

In almost all these cases, the IJs are conducting proceedings remotely because they are physically located in venues other than those where the Somali nationals appearing before them live. Maynard Decl. ¶ 10; Boyd Decl. ¶ 7; Fuchs Decl. ¶ 6; Carr Decl. ¶ 14; Streefland Decl. ¶ 4; Dhawan-Maloney Decl. ¶ 6; Pickering Decl. ¶ 7. Until the recent adoption of this Policy, it was highly unusual for non-detained individuals' cases to be heard remotely by IJs sitting in another part of the country. Maynard Decl. ¶¶ 8, 16; Boyd Decl. ¶ 14; Streefland Decl. ¶ 5; Dhawan-Maloney Decl. ¶ 6; Pickering Decl. ¶ 9; Mockenhaupt Decl. ¶ 6. Appearing in person is advantageous for Somali nationals, especially where translation is required. Hines Decl. ¶ 32. And there are active IJs in the relevant jurisdictions who could hear the cases of these individuals in person. Hines Decl. ¶ 32.

15

All three aspects of the Policy represent an abrupt departure from the status quo in immigration proceedings. The record also makes clear that this Policy applies only to Somalis. With one exception, Ms. Hines has "not had asylum cases advanced for an individual who is not a native/citizen of Somalia." Hines Decl. ¶ 39. And in fact, that lone exception just illustrates how the Policy works: Ms. Hines has an Ethiopian client who appears to be categorized under "Somalia" in the EOIR system, so it is no surprise that her hearing has been expedited under the Policy. Hines Decl. ¶ 39. Again, Ms. Hines's experience is not at all unique. Boyd Decl. ¶ 11 (attorney's non-Somali cases are proceeding as usual in front of IJs in their jurisdiction, with merits hearings scheduled as far out as 2029); Kline Decl. ¶¶ 5–6 (attorney's Somali cases have been advanced for merits hearings, while other cases have not); Carr Decl. ¶ 8 (dozens of Ethiopian clients with pending asylum applications have not been scheduled for hearings); Dhawan-Maloney Decl. ¶ 10 ("I have not had a single case with a non-Somali Respondent set for a new master calendar hearing and then subsequently set for merits hearing in the last two months."); Lowry Decl. ¶ 7; Mockenhaupt Decl. ¶¶ 5, 8; Petersen Decl. ¶ 14.

Somali cases have been transferred to this new fast-track docket even under particularly unusual circumstances. One Texas attorney represents a Somali national under the age of 18 whose case was on the juvenile docket in El Paso. Maynard Decl. ¶¶ 7–8. On short notice, the case was transferred off the juvenile docket and onto an adult docket before IJ Ashworth—even though such a transfer is extremely uncommon. Maynard Decl. ¶¶ 9, 15. In another telling example, a Washington State attorney had a Somali client scheduled for a May 5, 2026, merits hearing before a Seattle IJ. Boyd Decl. ¶ 12. The hearing was reassigned to a California IJ on the Somali docket and reset for a merits hearing on May 22, 2026, meaning that her hearing will be completed remotely and *later* than it otherwise would have been. Boyd Decl. ¶ 12. And in yet another case, a

Somali's merits hearing was "prioritized for completion" (according to the IJ) and was advanced to April 2026 even though he is in state confinement for a criminal conviction and will not be parole-eligible until 2032. Brown Decl. ¶¶ 3, 9–10. These are all deviations from standard practice.

## V.    The Somali Fast-Track Policy irreparably harms Plaintiffs.

Defendants' new Policy targeting non-detained Somali nationals for fast-tracked proceedings has already inflicted enormous harm on Plaintiffs and the clients and communities they serve. That harm will only continue to grow absent immediate relief.

***Hines Immigration Law, PLLC***. The Hines Firm is the private law firm of a solo practitioner (Ms. Hines) who specializes in non-detained asylum cases, largely in Minnesota. Hines Decl. ¶¶ 2, 8, 10–13. The Policy has irreparably harmed the Hines Firm's core work, business interests, reputation, and clients.

The Hines Firm's core work includes providing high-quality legal representation to non-detained asylum applicants before EOIR. Hines Decl. ¶¶ 8, 13. The Policy substantially impedes this work because it upends the timeline on which the firm must prepare for each Somali client's individual merits hearings. Instead of having at least a year to prepare, the firm now must somehow prepare for dozens of complex, high-stakes hearings with only a few months—and in some cases, mere weeks—of notice. *E.g.*, Hines Decl. ¶¶ 58–76.

The Policy's impact on the Hines Firm has been staggering. Ms. Hines—the firm's founder and sole attorney—undertook her existing caseload with the reasonable expectation that individual merits hearings would proceed at the usual pace and that she would have at least one year to prepare for any given hearing. Hines Decl. ¶¶ 13, 20, 124. Ms. Hines typically invests at least 120 hours—and often much longer—preparing once the merits hearing date is set. Hines Decl. ¶ 30. Under the Policy, however, Ms. Hines will have to prepare at least 39, and up to 71, existing Somali cases for merits hearings over the next four months. Hines Decl. ¶¶ 37, 79. Even if Ms. Hines were to

17

work 12-hour days, seven days a week, she would be thousands of hours short of what is necessary to give each case the attention it requires. Hines Decl. ¶ 79. As a result, absent massive changes to the Hines Firm's business model—which may not even be feasible—it is essentially impossible for the firm to meet its core business obligations to both Somali and other clients while the Policy remains in place. Hines Decl. ¶¶ 77, 83–87. The Hines Firm has already been forced to divert resources to combat the effects of the Policy, and it has completely closed its doors to any new business while it deals with the flood of new hearings set under the Policy. Hines Decl. ¶¶ 88, 93–96.

Relatedly, the Hines Firm is facing and will continue to face significant monetary injury because of the Policy. Because the Hines Firm cannot possibly maintain even its current caseload unless it hires and pays for additional attorneys—which is itself not feasible under the circumstances—it will lose paying clients. Hines Decl. ¶¶ 92, 96. Indeed, based on advice she has received from ethics counsel, Ms. Hines will likely need to withdraw from a significant number of Somali cases because the Policy makes it nearly impossible for her to satisfy her ethical obligations to clients. Hines Decl. ¶¶ 124, 127. Meanwhile, the Hines Firm has been forced to cease accepting any new clients due to the current volume of cases. Hines Decl. ¶ 95. And the Policy is wreaking havoc on the Hines Firm's finances because the firm's typical payment schedule is tied to individual hearing dates. Hines Decl. ¶ 89. Clients have been struggling to make payments on expedited timelines, and therefore the Hines Firm has not been able to pay its sole attorney a full salary. Hines Decl. ¶¶ 90–92.

The Policy is also inflicting reputational harm on the Hines Firm. Ms. Hines has devoted her career to immigration law and has worked to build a sterling local reputation for her firm in that field. Hines Decl. ¶ 97. Because of the Policy, however, Ms. Hines has been forced to prepare

18

for individual hearings on a compressed timeline and therefore must withdraw from existing representations, while also turning down all new business. Hines Decl. ¶¶ 95, 127. The Policy puts the Hines Firm's exemplary success rate in defensive asylum cases in jeopardy as well, Hines Decl. ¶ 29, since it gives Ms. Hines substantially less time to prepare each client's case, and it requires her to appear before IJs who are likelier than average to deny asylum claims. The Policy thus threatens irreparable and incalculable harm to the Hines Firm's reputation and standing in the community. Hines Decl. ¶¶ 97–99. And it is "very possible . . . that Hines Immigration Law may be fundamentally unable to exist beyond this summer, as a direct result of the Somali Fast-Track Policy." Hines Decl. ¶ 100.

Finally, by denying the Hines Firm's clients the fair proceedings guaranteed by the INA and due process, the Somali Fast-Track Policy harms third parties with whom the firm has a close relationship: clients who seek to receive its assistance in navigating removal proceedings before the EOIR. The Hines Firm's Somali clients face significant obstacles to bringing litigation themselves, especially given their fear of retaliation from the government and the high stakes of their individual proceedings. Hines Decl. ¶ 104.

*The Advocates for Human Rights*. AHR is a Minneapolis-based nonprofit organization that "works to promote and protect human rights worldwide," including by providing "free, high-quality legal representation to low-income immigrants in the Upper Midwest." Sandison Decl. ¶¶ 5, 10. Without relief, the Somali Fast-Track Policy will continue to irreparably harm AHR by impairing its core programs, frustrating the organization's mission, requiring AHR to divert resources to meet its communities' critical need for support, and injuring its clients.

Facilitating high-quality immigration legal services and observing immigration court proceedings are at the heart of AHR's core business activities. Sandison Decl. ¶¶ 16, 27. The

19

Policy impairs AHR's ability to do both. First, because the Policy has overwhelmed the capacity of the private attorneys who specialize in this area and with whom AHR frequently partners, AHR has been unable to find volunteer attorneys to handle the new urgent requests for representation from non-detained Somali individuals whose cases are being rapidly advanced. Sandison Decl. ¶¶ 28–29. Instead, AHR's staff attorneys have taken on the work of ensuring that the unrepresented Somalis reaching out to them have at least some support and guidance going into their upcoming hearings, though they are unable to provide full representation given their own significant capacity limitations. Sandison Decl. ¶¶ 29–30. Second, because hearings taking place pursuant to the Somali Fast-Track Policy are largely being conducted virtually via Webex, AHR's volunteer court observers have not had access to the proceedings. Sandison Decl. ¶ 36. This aspect of the Policy makes it very difficult for AHR "to document and report on what is going on during immigration hearings for Somalis." Sandison Decl. ¶ 36.

These developments have presented obstacles to AHR's primary mission. The Policy makes it more difficult for AHR to ensure that fundamental human rights are protected in our immigration system through representation and observation, to reinforce the rule of law by engaging volunteer attorneys in pro bono services, and to provide rapid response to the influx of inquiries it is receiving from members of the community. Sandison Decl. ¶¶ 5, 11, 27, 37.

As a result, the Policy has drained the organization's resources, forcing it to divert staff time from its core programs to meet the pressing needs that the Policy creates. For example, AHR's new managing attorney has shifted her time and attention away from her supervision and management responsibilities to develop an emergency response to the Policy. Sandison Decl. ¶ 33. Moreover, every time AHR's attorneys take on a new urgent legal consult for a Somali individual who is either unrepresented or newly needs legal assistance because their retained counsel is unable

20

to continue representing them, that puts a significant strain on their ability to manage their other clients and projects. Sandison Decl. ¶¶ 30–31.

Finally, the Policy denies AHR's staff and volunteer attorneys the right to provide effective representation to their clients, and it denies AHR's clients the right to fair proceedings and equal protection. Sandison Decl. ¶¶ 29, 33.

## LEGAL STANDARD

Section 705 of the APA authorizes a court reviewing an agency action to "issue all necessary and appropriate process to postpone the effective date of [the] agency action or to preserve status or rights pending conclusion of the review proceedings," "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. In deciding whether to issue a § 705 stay, the Court considers the familiar four-factor test governing preliminary injunctions. *See, e.g.*, *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020). Accordingly, Plaintiffs must establish that "(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *Id.* (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

The federal government's decision to abruptly fast-track the immigration proceedings of Somali nationals is not only cruel and chaotic, but also unlawful. Defendants have violated the Administrative Procedure Act by adopting a policy of resolving the immigration cases of non-detained Somalis on a dedicated nationalized docket, before a small subset of IJs, on a highly accelerated timeline that leaves attorneys with insufficient time to prepare their clients' cases. This Somali Fast-Track Policy contravenes the INA's guarantees that noncitizens have meaningful access to counsel and a full and fair removal proceeding. And it is quintessential arbitrary and

21

capricious agency action, for which there could be no reasoned basis, as Defendants upended the weighty reliance interests of Somali noncitizens and their attorneys when they departed from the long-established status quo in immigration proceedings.

The Policy has irreparable and dire consequences. It puts Somali asylum seekers at an increased risk of removal—to countries where they may face persecution and threats of physical violence—because their attorneys cannot feasibly devote the time they typically would to each case. The targeted nature of the Policy compounds that harm: attorneys who have worked to build a Somali client base have seen their dockets overloaded in recent weeks, leaving them in an ethical quagmire and potentially necessitating their withdrawal from certain cases. On the other side of the ledger, Defendants face no countervailing harms from a § 705 stay that halts this unlawful practice and restores the status quo in these proceedings. The factors for emergency relief are plainly met, and the Court should grant Plaintiffs' motion for a stay.

## I.    Plaintiffs are likely to show that the Somali Fast-Track Policy violates the APA.

Under the APA, courts can review "final agency action" and must set it aside if it is "not in accordance with law" or "arbitrary [and] capricious." 5 U.S.C. §§ 704, 706(2)(A), (C). Defendants' Somali Fast-Track Policy is final agency action and should be set aside under the APA for two independent reasons: it is contrary to law and arbitrary and capricious. Plaintiffs are therefore likely to succeed on the first two counts of the complaint.[4]

### A.  The Somali Fast-Track Policy is final agency action.

The Somali Fast-Track Policy is a reviewable final agency action. As an initial matter, "agency action need not be in writing to be judicially reviewable as a final action." *Aracely, R. v.*

---

[4] In addition to their APA claims, Plaintiffs assert constitutional claims that the Policy violates due process, equal protection, and the First Amendment. Complaint ¶¶ 89–102. Plaintiffs do not seek relief on those claims in this motion.

*Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018); *see also Venetian Casino Resort LLC v. EEOC,* 530 F.3d 925, 929 (D.C. Cir. 2008) (concluding that "the record" as a whole "leaves no doubt" that a policy exists, even though "the details . . . are still unclear"); *Grand Canyon Trust v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003) (holding that "[b]oth law and logic" dictate that an unwritten agency policy is reviewable). Rather, to qualify as final, agency action (1) "must mark the consummation of the agency's decisionmaking process," and (2) "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citation omitted). Both conditions are met here.

First, Defendants have completed their decisionmaking process. "The consummation prong of the finality inquiry requires [courts] to determine 'whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue,' or is, instead, 'only the ruling of a subordinate official, or tentative.'" *NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) (quoting *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018)). Here, the Somali Fast-Track Policy "reflect[s] a settled agency position," *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000), as demonstrated by Defendants' uniform approach to scheduling non-detained Somali nationals' immigration hearings across jurisdictions. *See supra* section IV; *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (finding that ICE's unwritten policy of considering an allegedly impermissible factor in custody determinations was final agency action because it was "*particularized*" as opposed to a "generalized complaint about agency behavior" (citation omitted)); *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 326 (D.D.C. 2011) ("Plaintiffs must first identify the 'policy or custom' they contend violates [the law] and then establish that the 'policy or custom' is common

23

to the class."); *cf. Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (concluding that "a final agency action requires more" than an "amorphous description of the [agency's] practices"). Indeed, individual IJs have stated that their "hands are tied" by the "powers that be" when it comes to scheduling hearings for Somali nationals. Mockenhaupt Decl. ¶ 7; Hines Decl. ¶ 58. One immigration court clerk confirmed that expedited hearings for Somali nationals had been scheduled by "Headquarters." Kline Decl. ¶ 11. In other words, "the writing is on the wall" with respect to the acceleration of immigration hearings for non-detained Somali nationals. *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016).

Second, there is no question that the Policy determines Somali nationals' rights in their immigration cases, and it plainly has legal consequences. Defendants have already targeted hundreds, if not more, Somali nationals for expedited immigration proceedings under the Policy, and they do not appear to be slowing down. *E.g.*, Hines Decl. ¶ 81 (39 Somali merits hearings scheduled); Carr Decl. ¶¶ 11–12 (more than 70 Somali merits hearings scheduled); Mockenhaupt Decl. ¶¶ 9–10 (roughly 50 Somali merits hearings scheduled). The Policy plainly has a "direct and immediate" effect on the "day-to-day" business of the parties. *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *see also Las Ams. Immigrant Advoc. Ctr. v. Trump*, 475 F. Supp. 3d 1194, 1216 (D. Or. 2020) (finding agency actions final where "[b]oth policies change the way immigration judges run their dockets and their courtrooms"). And where, as here, an agency policy eliminates agency staff discretion, it has legal consequence sufficient to establish finality. *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019); *Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, No. 25-cv-243, 2026 WL 280089, at *3 (D. Md. Feb. 3, 2026). The policy therefore meets the APA's "pragmatic" finality

24

test. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (citation omitted); *see Biden v. Texas*, 597 U.S. 785, 808–09 (2022).

**B. The Somali Fast-Track Policy is contrary to law.**

The Somali Fast-Track Policy is contrary to law because it violates the INA in at least two ways: it prevents non-detained Somali nationals in immigration proceedings from being meaningfully represented by the counsel of their choice, and it deprives them of the right to a full and fair removal proceeding.

First, the Policy violates the statutory right to counsel. The INA guarantees noncitizens "the privilege of being represented (at no expense to the Government) by [] counsel . . . as he shall choose." 8 U.S.C. § 1362. For noncitizens facing deportation, "[t]he right to counsel is a particularly important procedural safeguard because of the grave consequences of removal." *Leslie v. Att'y Gen. of U.S.*, 611 F.3d 171, 181 (3d Cir. 2010). Given the "high stakes of a removal proceeding and the maze of immigration rules and regulations," "[o]ne way we ensure that the 'standards of fairness' are met is by guaranteeing that [noncitizens] have the opportunity to be represented by counsel." *Biwot*, 403 F.3d at 1098. The right to counsel requires *meaningful* representation. *See, e.g.*, *McFarland v. Scott*, 512 U.S. 849, 858 (1994) ("[T]he right to counsel necessarily includes a right for that counsel meaningfully to research and present a defendant's . . . claims."). Thus, Defendants "must provide [noncitizens] with reasonable time to locate counsel and permit counsel to prepare for the hearing." *Biwot*, 403 F.3d at 1099; *see Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 554 (9th Cir. 1990) (noncitizens' right to counsel "must be respected in substance as well as in name" (citation omitted)).

For the right to counsel to be meaningful, Defendants cannot impose "obstacles" such as "time restrictions" that have "the cumulative effect of … prevent[ing] [noncitizens] from contacting counsel and receiving any legal advice." *Orantes-Hernandez*, 919 F.2d at 565–66. But

25

the Somali Fast-Track Policy does precisely that. The Policy renders Somali noncitizens' right to counsel meaningless by severely compressing the timeframe under which counsel must be identified, agree to representation, and prepare the case. *E.g.*, Jabane Decl. ¶ 2 (noting short preparation timelines for merits hearings). The Policy's fast-tracking makes it nearly impossible for immigration attorneys to adequately prepare for individual merits hearings in compliance with their ethical obligations. *E.g.*, Hines Decl. ¶¶ 59, 77–82; Mockenhaupt Decl. ¶ 9. Because these attorneys cannot adequately prepare, and in some cases will be forced to withdraw, Hines Decl. ¶ 127, the Policy plainly interferes with Somali noncitizens' ability to meaningfully exercise their right to the counsel of their choice in these proceedings. *See Immigrant Defs. L. Ctr. v. Noem*, 781 F. Supp. 3d 1011, 1050 (C.D. Cal. 2025) (organization likely to succeed on right to access counsel claim where challenged policy limited window for attorney-client consultations and otherwise obstructed legal representation); *Torres v. DHS*, 411 F. Supp. 3d 1036, 1060 (C.D. Cal. 2019) (plaintiffs stated access to counsel claim where the "cumulative nature of the hindrances alleged . . . were tantamount to the denial of counsel"). And because the Policy is broadly affecting immigration attorneys in regions with significant Somali populations, many of these noncitizens will be left with no counsel at all. Hines Decl. ¶¶ 125–27; Sandison Decl. ¶ 28; *see also Zaid v. Exec. Off. of President*, No. 25-cv-01365, 2025 WL 3724884, at *11 (D.D.C. Dec. 23, 2025) (attorney likely to succeed on right to counsel claim where challenged government action "forced his clients to litigate their cases without the benefit of their chosen counsel"); *Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15, 54 (D.D.C. 2025) (granting summary judgment on right to counsel claim because executive order "cuts [the firm] off at the knees and effectively denies the firm's clients its counsel").

Second, the Policy violates the right to a full and fair proceeding. The INA guarantees noncitizens "a reasonable opportunity to examine the evidence against [them], to present evidence on [their] own behalf, and to cross-examine witnesses presented by the Government." 8 U.S.C. § 1229a(b)(4)(B). It further provides that "[t]he determination of the immigration judge shall be based only on the evidence produced at the hearing." *Id.* § 1229a(c)(1)(A). In short, a noncitizen facing removal "is entitled to a full and fair removal hearing." *Matter of R-C-R-*, 28 I. & N. Dec. 74, 77 (BIA 2020). "For a removal hearing to be fair, the arbiter presiding over the hearing must be neutral and the immigrant must be given the opportunity to fairly present evidence, offer arguments, and develop the record." *Tun v. Gonzales*, 485 F.3d 1014, 1025 (8th Cir. 2007).

The Policy interferes with these guarantees in multiple ways. Because of the expedited hearings—targeted specifically at Somali noncitizens who are not detained—attorneys can no longer devote the amount of time necessary to fully prepare these complex cases. *E.g.*, Hines Decl. ¶¶ 59, 77–82. In some cases, merits hearings have been scheduled with less than thirty days' notice, meaning that the default deadline to submit essential supporting documents has already passed. *E.g.*, Lowry Decl. ¶ 5. In others, attorneys have mere days to gather the voluminous and specialized evidence they need to support their clients' claims for relief. *E.g.*, Hines Decl. ¶¶ 70–71. Under these circumstances, it is hard to see how the Somali noncitizens singled out by the Policy have a "reasonable opportunity" to present evidence and develop the record. *See Torres*, 411 F. Supp. 3d at 1062 (plaintiffs stated claim for violation of right to examine and present evidence where defendants restricted their ability to obtain witness affidavits and other key evidence).

The Policy has also turned the hearings themselves into a farce. Defendants have stripped away the opportunity for meaningful, individualized consideration to which a noncitizen is entitled and have installed in its place a bizarre scheme in which several cases are called at once, attorneys

suddenly have multiple hearings scheduled before different IJs in the same time slot, and complex merits hearings are crammed into thirty-minute windows. *E.g.*, Hines Decl. ¶¶ 47–48, 57; Kline Decl. ¶¶ 11, 14. To make matters worse, the Policy shuttles Somalis to remote hearings around the country before IJs with above-average removal rates—a radical departure from the usual practice of having them appear in person before IJs in their home jurisdiction. *E.g.*, Hines Decl. ¶ 32; Thal Decl. ¶¶ 16–17. Defendants have thus placed a heavy thumb on the scale in favor of removal, depriving Somali noncitizens of their right to a full and fair proceeding before an impartial adjudicator. *See Las Ams.*, 475 F. Supp. 3d at 1214 (plaintiffs pleaded facts suggesting systemic bias against immigrants and asylum seekers by pointing to "unusually high rate of denials for asylum petitions in some courts," "policies that require judges to fast-track certain cases or certain [noncitizens]," and statements from former attorney general and president).

### C.  The Somali Fast-Track Policy is arbitrary and capricious.

Under the APA, courts must set aside agency action that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). This "standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "To be regarded as rational, an agency must also consider significant alternatives to the course it ultimately chooses." *Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000). While agencies are free to change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

28

The Somali Fast-Track Policy is arbitrary and capricious for multiple reasons. First, Defendants failed to consider several important aspects of the problem. Defendants did not account for the enormous harm accelerating hearings in removal proceedings would have on Somali nationals, whose attorneys now face the prospect of inadequate time to prepare their cases. *E.g.*, Hines Decl. ¶¶ 59, 77–82. In some cases, attorneys will likely be forced to withdraw to comply with their ethical obligations, leaving these noncitizens to fend for themselves in proceedings with life-and-death stakes. Hines Decl. ¶¶ 125–27. These individuals will be hard-pressed to obtain relief on their own even in meritorious cases, meaning that more erroneous removals of noncitizens entitled to relief will occur. Hines Decl. ¶ 120.

Defendants also failed to consider the impact of the Policy on the attorneys themselves, who have been placed in ethical quagmires and have had their dockets thrown into chaos. *E.g.*, Hines Decl. ¶¶ 121–27. And the Policy has affected several other stakeholders and communities, including organizations that facilitate immigration legal services and offer consultations and resources, but are now overrun with requests for assistance. Sandison Decl. ¶¶ 24–37 (describing surge in outreach and strain on resources). Defendants accounted for none of these important aspects of the problem in adopting the Somali Fast-Track Policy. *See State Farm*, 463 U.S. at 43.

Second, Defendants substantially changed existing policies without acknowledgment or explanation. Previously, non-detained Somalis seeking relief from removal went through the same process as everyone else: master calendar hearings were vacated if written pleadings had been submitted; merits hearings were set at least six months (and usually longer) in advance; and cases were heard by an IJ in the noncitizen's jurisdiction. *E.g.*, Hines Decl. ¶¶ 18, 32; Dutt Decl. ¶ 5. In fact, EOIR guidance makes clear that merits hearings "are typically scheduled far in advance, which provides ample opportunity for preparation time, and often involve interpreters or third-party witnesses whose schedules have been carefully accommodated." PM 21-13, at 5; *see also id.*

29

(stating that "an individual merits hearing is typically scheduled far in advance and generally only after considering the availability of a respondent's representative"). This advance notice is essential for attorneys to prepare arguments and gather documents in these intricate cases. *E.g.*, Hines Decl. ¶¶ 21–28.

Without warning, Defendants have changed course. As detailed above, non-detained Somali cases have been expedited to an unprecedented degree under the Policy. Instead of having six months' notice or more before a merits hearing, attorneys now must prepare for these proceedings in as little as thirty days. *E.g.*, Kline Decl. ¶ 7. Moreover, these cases are now being heard remotely by IJs with higher-than-average denial rates who sit outside the noncitizen's jurisdiction. *E.g.*, Mockenhaupt Decl. ¶ 6; Thal Decl. ¶¶ 16–17. Defendants' failure to reasonably explain or even acknowledge this change in policy is arbitrary and capricious. *See Fox*, 556 U.S. at 515.

Third, Defendants failed to consider weighty and longstanding reliance interests. Immigration-focused legal service providers, like the Hines Firm, carefully design and manage their dockets to ensure they have adequate time to comply with ethical obligations by giving each case the extensive preparation it requires. *E.g.*, Hines Decl. ¶¶ 12–13. In doing so, these attorneys have reasonably expected that the predictable, established timelines to gather evidence and prepare for non-detained removal proceedings would continue to be followed. *E.g.*, Hines Decl. ¶ 21. Indeed, they may face sanctions if they do not manage their caseload responsibly. PM 21-13, at 5. Noncitizens in removal proceedings also have substantial interests in being able to appear before immigration judges with their chosen counsel, as the INA and EOIR regulations contemplate. 8 U.S.C. §§ 1229a(b)(4)(A), 1362; 8 C.F.R. § 1240.10(a)(1). These individuals had no reason to expect that their attorneys would suddenly be deluged with hearings, leaving those attorneys unable to devote the same attention to their cases. Finally, other organizations that facilitate

30

immigration legal services and support asylum seekers have relied on the status quo, which allows for a manageable flow of incoming clients—as opposed to the overwhelming surge they have seen in recent weeks. Sandison Decl. ¶¶ 24–37. Defendants completely disregarded all these reliance interests, which further renders the Policy arbitrary and capricious. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30–31 (2020).

Fourth, Defendants gave no apparent consideration to reasonable alternatives to the Policy. "An agency is required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. U.S. Dep't of Transp. & Fed. Aviation Admin.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (internal quotation marks and citation omitted). While it is hard to imagine it could ever be reasonable to target a particular nationality in this manner, to the extent Defendants sought to expedite consideration of pending cases, they could have easily scheduled merits hearings without accelerating the timeline to such a degree that it is nearly impossible for attorneys to fulfill their ethical obligations to clients. And Defendants could have done so without abruptly departing from the customary practice by transferring Somali cases to out-of-venue IJs. Defendants' failure to consider reasonable alternatives to the chosen policy was arbitrary and capricious. *See id.*

Fifth, Defendants failed to consider or even acknowledge the Policy's impact on the constitutional and statutory rights of noncitizens in removal proceedings, as well as the rights of their attorneys. As discussed above, noncitizens are entitled to the counsel of their choice and to a full and fair proceeding. Attorneys also have their own interests in being able to counsel their clients. But the Policy severely undermines counsel's ability to timely and effectively prepare their clients' cases for hearings. Defendants apparently gave no consideration to the myriad ways in which the Policy tramples on these fundamental rights.

31

Finally, Defendants failed to consider their own regulations and guidance, which emphasize the importance of the right to counsel in removal proceedings and highlight the discretion of immigration judges. EOIR regulations dictate that attorneys must provide competent representation, 8 C.F.R. § 1003.102(o), and must "[r]easonably consult with the client about the means by which the client's objectives are to be accomplished," which includes "the duty to meet with the client sufficiently in advance of a hearing or other matter to ensure adequate preparation of the client's case," *id.* § 1003.102(r)(2). EOIR guidance further requires attorneys to ensure that their dockets are not overloaded. PM 21-13, at 5. But the Policy forces attorneys to juggle numerous hearings on short notice, sometimes scheduled for the same time slot on the same day. *E.g.*, Hines Decl. ¶¶ 47–48. The Policy thus disregards the agency's own regulations and guidance and makes it nearly impossible for attorneys to comply with their obligations of competence and diligence.[5]

## II. Plaintiffs face irreparable harm absent emergency relief.

The Somali Fast-Track Policy has already inflicted irreparable harm on Plaintiffs, and that harm will only worsen absent a stay. The Policy raises "obstacles [that] unquestionably make it more difficult for [Plaintiffs] to accomplish their primary mission." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). These obstacles, described below, "provide injury for purposes both of standing and irreparable harm." *Id.*

---

[5] The Policy also interferes with EOIR regulations vesting broad discretion in immigration judges over their cases, 8 C.F.R. § 1003.10(b), and with EOIR guidance providing that "no EOIR employee or officer can direct any adjudicator to rule in a particular way on a matter before him or her in the first instance," PM 25-42, at 2; *see also* PM 25-47, at 3 (stating that "the designation of a case as a priority is not intended to limit the discretion afforded an Immigration Judge under applicable law, nor is it intended to mandate or direct a specific outcome in any particular case"). Noncitizens forced to appear for hearings without counsel—or with counsel who has had inadequate time to prepare—are far less likely to succeed in obtaining relief. Hines Decl. ¶ 120. The Policy effectively strips immigration judges of their discretion in individual cases by depriving applicants of a meaningful right to counsel, thereby tilting the scales against relief.

For the Hines Firm, the Policy has had a devastating effect on the firm's mission, which is to provide expert, high-quality, culturally sensitive, and trauma-informed legal services to asylum seekers. Hines Decl. ¶ 8. As Ms. Hines explains, the Policy has made it immeasurably more difficult for the firm to provide the high quality of representation that clients are accustomed to. Hines Decl. ¶ 77. Because of the volume of cases being expedited, it is simply not sustainable for Ms. Hines to devote the amount of preparation to each case that she otherwise would. Hines Decl. ¶¶ 78–82. The firm's non-Somali cases have suffered as well, since Ms. Hines cannot give them the same level of attention that clients have come to expect. Hines Decl. ¶¶ 93–94.

As courts in this District have explained, "[r]eputational injury may also be considered irreparable." *Urb. Sustainability Directors Network v. U.S. Dep't of Agric.*, No. 25-cv-1775, 2025 WL 2374528, at *36 (D.D.C. Aug. 14, 2025); *accord, e.g.*, *S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 72 (D.D.C. 2025). The Hines Firm is facing—and will continue to face— reputational harm because of the Policy. Despite the extraordinary efforts of Ms. Hines and her staff, the Policy "is making it impossible for [Ms. Hines] to practice law or run a law firm that lives up to the standards for which [she is] known." Hines Decl. ¶ 97. As a result, both Somali and non-Somali clients have begun to express frustration with the firm's capacity to represent them. Hines Decl. ¶ 98. This frustration—which will almost certainly increase absent relief—harms both Ms. Hines's professional reputation and the viability of her firm. Hines Decl. ¶¶ 96–100. The threatened reputational damage to the Hines Firm stemming from the Policy further demonstrates irreparable harm. *See, e.g.*, *Susman Godfrey*, 789 F. Supp. 3d at 56 (finding irreparable harm where law firm "suffered reputational harms that are not monetarily reparable and that would continue if the court did not enter a permanent injunction").

The Policy has also irreparably harmed the Hines Firm's relationships with clients. The Policy has made it "nearly impossible" for Ms. Hines to satisfy her ethical obligations to all her

clients. Hines Decl. ¶ 109. She has been forced to reach out to other firms and nonprofit partners, only to find that their dockets are similarly swamped because of the Policy. Hines Decl. ¶¶ 110–11. As a result, Ms. Hines faces the imminent prospect of being forced to withdraw from her clients' cases, leaving them without the counsel of their choice—and perhaps no counsel at all—in proceedings with literal life-and-death stakes. Hines Decl. ¶¶ 112, 127. This interference with the attorney-client relationship, which is directly traceable to the Policy, also constitutes irreparable harm. *See, e.g.*, *Zaid*, 2025 WL 3724884, at *12 (concluding that interference with attorney-client relationship is "precisely the type of harm that is 'beyond remediation' by a court after the fact" (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006))); *Emons Indus., Inc. v. Liberty Mut. Ins. Co.*, 749 F. Supp. 1289, 1293 (S.D.N.Y. 1990) (injury from forcing client to forgo counsel of choice "would be irreparable, as it would be impossible to quantify the harm suffered, and therefore impossible to compensate for it with money damages").

Finally, the Hines Firm has suffered financial injuries from the Policy. Ms. Hines attests that the Policy has upended her firm's financial model and fee structure, which were developed based on the long-established status quo for immigration proceedings. Hines Decl. ¶ 89. Under that model, retainer agreements include benchmarks for payment ninety days and thirty days before a client's merits hearing. Hines Decl. ¶ 89. Under the compressed timelines mandated by the Policy, however, many clients cannot meet their payment obligations, so the Hines Firm is generating less revenue despite staff working more hours than ever. Hines Decl. ¶¶ 90–92. On top of that, the Policy has forced the firm to turn away all new business and refund potential clients' consultation fees. Hines Decl. ¶ 95. These financial injuries establish injury-in-fact for standing purposes. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."). And while "'economic loss does not, in and of itself, constitute irreparable harm,'

34

there is an exception when 'the loss threatens the very existence of the movant's business,'" *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 172 (D.D.C. 2025) (citation omitted), or when the plaintiff's losses "could not be adequately compensated by legal remedies," *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 180 (D.D.C. 2025). Here, it is "very possible" that the Hines Firm "may be fundamentally unable to exist beyond this summer, as a direct result of the Somali Fast-Track Policy." Hines Decl. ¶ 100; *id.* ¶ 96 ("Without being able to take consultations and undertake work for new potential clients, our revenue stream will ultimately dry up."); *see Wilmer*, 784 F. Supp. 3d at 172 (finding irreparable harm where challenged order threatened "the very viability of the Firm's business model" (citation omitted)).

The Advocates for Human Rights likewise faces irreparable harm from the Policy. Facilitating high-quality immigration legal services and observing immigration court proceedings are at the heart of AHR's "core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). The Policy "perceptibly impair[s]" AHR's ability fulfill these activities. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). AHR has been unable to find volunteer attorneys to handle new urgent requests for representation from non-detained Somali individuals because the Policy has overwhelmed the capacity of its entire network of immigration lawyers. Sandison Decl. ¶¶ 28–29. Therefore, AHR's staff attorneys have taken on the work of ensuring that the unrepresented Somalis reaching out to them have at least some support and guidance going into their upcoming hearings, though they are unable to provide full representation given their own significant capacity limitations. Sandison Decl. ¶¶ 29–30. And AHR's volunteer court observers have not been able to access virtual hearings under the Somali Fast-Track Policy, which makes it very difficult for AHR to document and report on the proceedings. Sandison Decl. ¶ 36.

The Policy accordingly makes it more difficult for AHR to fulfill its core mission to ensure that fundamental human rights are protected in the immigration system through representation and

35

observation, to reinforce the rule of law by engaging volunteer attorneys in pro bono services, and to provide rapid response to the influx of inquiries it is receiving from members of the community. Sandison Decl. ¶¶ 5, 11, 27, 37.

The Policy has consequently drained the organization's resources, forcing it to divert staff time from its core programs to meet the pressing needs that the Policy creates. *See Havens Realty*, 455 U.S. at 379. For example, AHR's new managing attorney has shifted her time and attention away from her supervision and management responsibilities to develop an emergency response to the Policy. Sandison Decl. ¶ 33. Moreover, every time AHR's attorneys take on a new urgent legal consult for a Somali individual who is either unrepresented or newly needs legal assistance because their retained counsel is unable to continue representing them, that puts a significant strain on their ability to manage their other clients and projects. Sandison Decl. ¶¶ 30–31.

### III. The balance of the equities and the public interest favor Plaintiffs.

The final two § 705 stay factors—balancing the equities and weighing the public interest— "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Here, Plaintiffs' strong likelihood of success on the merits, discussed above, itself establishes that the equities and public interest favor preliminary relief. "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks omitted). Rather, "there is a substantial public interest in having governmental agencies abide by the federal laws . . . that govern their existence and operations." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (internal quotation marks omitted). There is therefore "generally no public interest in the perpetuation of unlawful agency action." *Id.* (internal quotation marks omitted). And "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *Northern Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

Plaintiffs and their clients, meanwhile, will suffer critical harm if the Somali Fast-Track Policy remains in place. As explained above, the Policy strains the resources and capacity of Plaintiffs—limiting the number of noncitizens they can effectively serve—and will thwart meritorious claims for relief. The result is that Somali noncitizens will face unjust removal from the United States and be sent to countries where they will potentially face persecution and threats of physical violence. Hines Decl. ¶¶ 112–17. And there is undoubtedly "a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436.

On the other side of the balance, Defendants will merely "be required to keep in place" the long-standing immigration court procedures that pre-date the Somali Fast-Track Policy "while judicial review of [their] new [policy] runs its course." *District of Columbia*, 444 F. Supp. 3d at 45. "That hardship pales in comparison to the injuries asserted by the plaintiffs." *Id.* Staying the Policy until the Court can determine its lawfulness merely "preserve[s] the relative positions of the parties" as they existed prior to the Policy taking effect in late January 2026. *Robertson v. Cartinhour*, 429 F. App'x 1, 2 (D.C. Cir. 2011) (citation omitted).

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion and stay the Somali Fast-Track Policy pursuant to 5 U.S.C. § 705, in accordance with Plaintiffs' proposed order.

Date: March 24, 2026                          Respectfully submitted,

                                              */s/ Jyoti Jasrasaria*_____
                                              Jyoti Jasrasaria (D.C. Bar No. 1671527)
                                              Michael J. Torcello (D.C. Bar No. 90014480)
                                              Yenisey Rodríguez (D.C. Bar No. 1600574)
                                              Robin F. Thurston (D.C. Bar No. 1531399)
                                              Democracy Forward Foundation
                                              P.O. Box 34553

37

Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
jjasrasaria@democracyforward.org
mtorcello@democracyforward.org
yenisey.rodriguez@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*