**DECLARATION OF DR. JOSEPH GUNTHER**

I, Joseph Gunther, hereby declare under penalty of perjury that:

1.      I am over the age of 18 and competent to testify to the facts contained in this Declaration.

2.      The facts set forth in this Declaration are based on my own personal knowledge. If called as a witness, I could and would testify competently to the matters stated herein.

3.      I am an independent researcher and editor based in Brooklyn, New York. I received a bachelor's degree in mathematics from the University of Chicago, a master's degree in mathematics from the University of Texas at Austin, and a Ph.D. in mathematics from the City University of New York Graduate Center. I have published peer-reviewed articles in academic mathematical journals, including *Proceedings of the American Mathematical Society* and *Algebra & Number Theory*.

4.      My current research focuses on using public datasets to analyze immigration courts and Immigration and Customs Enforcement (ICE) arrests. My immigration-related data analyses have been cited in numerous media outlets, including *The New York Times*, *CBS News*, *Politico*, *NPR*, and *The Guardian*.

5.      For the calculations in this Declaration, I used the CASE immigration court dataset, which is posted monthly by the Executive Office for Immigration Review (EOIR) in the FOIA Library on its website.[1] The CASE dataset is extracted directly from the agency's case file electronic database, and it contains a wealth of information on every immigration court case since the 1990s, including respondent nationality and scheduling details for past, future, and canceled hearings. To analyze this large dataset, I use SQL, a standard

---

[1] *FOIA Library*, U.S. Dep't of Just., https://www.justice.gov/eoir/foia-library-0 (last visited Mar. 28, 2026). "CASE" is an acronym for Case Access System for EOIR.

programming language that has been widely used for more than five decades. My analysis is replicable by anyone who has familiarity with the CASE dataset and facility with SQL or a similar programming language.

6. I regularly use this same CASE dataset for my independent data analyses. For example, I used this dataset to develop the first method to quantify ICE arrests at immigration courts across the country.[2] I have also used this dataset to release comprehensive national reports on removal orders given for third countries.[3] In fact, entirely independent of my correspondence with Plaintiffs' counsel and before I became aware of any legal action, a co-author and I used the CASE dataset to conduct a detailed data analysis of 2026 hearing scheduling for Somali respondents in immigration court, which was released on March 24, 2026—just a few hours before this lawsuit was filed.[4]

7. For the present analysis, I primarily used the version of the CASE dataset released in early March 2026, which includes data current through the end of February 2026. I also used fourteen previous releases of the CASE dataset (with data current through the end of January 2026, the end of December 2025, the end of November 2025, and so forth, as far back as the release current through the end of December 2024), as will be explained below.

---

[2] Joseph Gunther, *Quantifying Immigration Court Arrests* (Oct. 7, 2025), https://perma.cc/Z46T-6NY5; *see also* Julia Ingram, *ICE Agents Target New York City Immigration Courts More Often Than Others, New Analysis Suggests*, CBS News (Oct. 8, 2025), https://perma.cc/Y6VU-P78W.

[3] Joseph Gunther & Brandon Marrow, *No Hearing Necessary: Updated Report on Pretermission and Third-Country Deportations in Immigration Court*, bklg blog (Mar. 16, 2026), https://perma.cc/34KJ-P3FL; *see also* Jazmine Ulloa, et al., *Trump Administration Pushes Asylum Seekers to Apply in Other Countries*, N.Y. Times (Dec. 20, 2025), https://www.nytimes.com/2025/12/20/us/trump-asylum-third-countries.html.

[4] Joseph Gunther & Brandon Marrow, *Two-Thirds of Open Somali Cases Placed on "Somali Rocket Docket": Report on Fast-Tracked Somali Cases in Immigration Court*, bklg blog (Mar. 24, 2026), https://perma.cc/2DDL-KJCZ.

8.      Plaintiffs' counsel asked me to summarize scheduling data for Somali and non-Somali respondents in non-detained immigration cases. Because I am now restricting my analysis to non-detained cases, there are slight variations between the numbers that I report in this Declaration compared to those I and my co-author reported in our March 24th analysis, which summarized scheduling data for all Somali and non-Somali respondents, without regard to their detention status.

9.      To conduct my analysis for this Declaration, I first compiled a list of non-detained immigration cases that had been open as of December 31, 2025, to use as a baseline for the rest of my analysis. For the rest of this Declaration, I will use "active" to mean that a case was open as of December 31, 2025. To compile this list of active non-detained cases, I looked at cases across the December, January, and February CASE data releases in order to restrict my baseline list to cases that were open as of the end of December, and that had remained in non-detained status through December, January, and February. I restricted my baseline in this way because I did not want to include cases that were newly opened in 2026 or that involved respondents who moved in and out of detention status in 2026; short-notice scheduling activity in such cases would be routine and therefore add noise to my analysis. My baseline list contained 3,329,909 active non-detained cases, of which 3,168 (less than 0.1%) had a listed nationality of Somalia.[5]

---

[5] Plaintiffs' Complaint and Emergency Motion state that about 2,700 open cases involve non-detained Somali nationals—which is a few hundred cases lower than the 3,168 I found for active non-detained cases. I understand that Plaintiffs' number was derived by selecting "never detained" cases on the Transactional Records Access Clearinghouse's (TRAC) Immigration Court Backlog tracker, but it failed to include "released" cases, which are also classified as non-detained. TRAC's Immigration Court Backlog tracker shows that the total number of Somali non-detained cases ("never detained" and "released" together) is 3,144. *Immigration Court Backlog*, Transactional Records Access Clearinghouse, https://tracreports.org/phptools/immigration/backlog (last visited Mar. 28, 2026). This is slightly less than my figure of 3,168 because my analysis examines cases that were open as of December 31, 2025 (i.e., "active"), but could potentially have been closed by February 28, 2026, the date on which TRAC's open case count is based.

10.     For that baseline list of active non-detained cases, I determined which Immigration Judge (IJ) each individual respondent had been assigned to as of 11:59 p.m. on December 31, 2025, and which IJ that same respondent had been assigned to as of 11:59 p.m. on February 28, 2026. Hearings in the dataset have a recorded input date, input time, and assigned IJ, so one can simply examine which IJ was listed for the most recently input hearing.[6] The input date is the date that an upcoming hearing was first entered into the system.

11.     For that same baseline list, I also determined how much notice—the number of days between a hearing's input date and its date on the court calendar—had been given for each case's most recently input hearing (without regard to the type of hearing).

12.     With this information, I made a list of "short-notice reassigned" cases: those for which 1) the assigned IJ had changed between December 31, 2025, and February 28, 2026, and 2) less than six months' notice was given for the most recently input hearing. I chose six months' notice because upon reviewing a sample of input data by hand, I noticed a pattern of hearings being scheduled for Summer 2026 in late January and February 2026, and I wanted to capture those cases.

13.     I then sorted all of the cases by nationality and examined the frequency of short-notice reassigned cases within each nationality (excluding rare nationalities with less than 100 active cases total).

14.     Somali cases had the highest proportion of short-notice reassigned cases compared to all other nationalities—many times over: two-thirds (66.9%) of active non-detained Somali cases (2,119 out of 3,168) had been reassigned to a new IJ on short notice.

---

[6] Throughout my analysis, I excluded from consideration all hearings marked in the CASE database as a "data entry error."

The next-highest proportion was for Bolivian cases: 4.4% (317 out of 7,271) had been short-notice reassigned.

15.    Figure 1 below illustrates the percentage of active non-detained cases that were reassigned on short notice by nationality group.

**Figure 1**



16.     The disparity between Somali and non-Somali cases persists even if the six-month "short notice" window is narrowed considerably. Some 57.5% of Somali cases were reassigned with less than three months' notice. And 47.3% of Somali cases were reassigned with less than two months' notice. For every other nationality group, the percentage of cases reassigned with less than three or two months' notice was lower than 2.4%. Notably, these percentages are conservative, as there are many Somali cases in which the original reassignment (a master calendar hearing) was done with less than two months' notice but the most recently input hearing (an individual merits hearing) was scheduled with more than two months' notice. Those cases are not captured in the two-month short-notice reassigned cases because I only used the most recently scheduled hearing for this analysis.

17.     Next, I examined the scheduling data for "individual" ("merits") hearings specifically (as opposed to more-administrative "master calendar" hearings). To control for case types associated with atypical procedural timelines—such as juvenile cases or, most importantly, detained cases, which generally proceed at an accelerated pace—I chose to analyze a subset of cases for this analysis: cases that were heard under the primary non-detained subdocket within all immigration courts that hear non-detained cases.[7] Together,

---

[7] Each case in the CASE dataset is coded for not only the base city of the immigration court, but also a more specific "subdocket" that typically corresponds to a sublocation within the court, the location of the respondent (e.g., a detention center), or a specialized court category under which the case is being handled. I selected cases from the primary subdocket within all immigration courts that hear non-detained cases.

For example, within the Fort Snelling immigration court in Minnesota, there are 25 subdockets, described in the CASE dataset as: Bloomington Detained Sherburne County; Bloomington Juvenile; Douglas County Jail; Federal Correctional Institution (FCI) Waseca; Fort Snelling; Fort Snelling—Asylum Rule Docket—ARD; Fort Snelling—Burleigh County Jail; Fort Snelling—CFR/RFR; Fort Snelling Dedicated Docket; Fort Snelling Detained Juvenile; Fort Snelling—DET—CFR/RFR; Fort Snelling—E33 Docket—E33; Fort Snelling—FERM Docket—FM; Fort Snelling—Grand Forks County Correctional; Fort Snelling—Lawrence County, SD; Fort Snelling—Northwest Regional Crookston; IAD HLOC—BLM, Minnesota; Jackson Parish Correctional Center; Minnesota Correctional Facility; North Dakota Department of Corrections; North Dakota VTC; South Dakota Department of Corrections; and South Dakota VTC. Based on my familiarity with the

these subdockets included over 97% of all non-detained Somali cases (whether short-notice reassigned or not), making them an appropriate universe of cases for comparison.

18.     For each individual hearing on these subdockets, I calculated the notice time—the number of days between the hearing's input date and its date on the court calendar. I then grouped these by input month, and by whether or not the hearing was for a Somali respondent. Finally, within each group, I calculated the median notice time.

19.     As a comparator, last year, for individual hearings input in February 2025, the median notice time was 504 days for Somali cases, and 471 days for non-Somali cases. As recently as January 2026, the individual-hearing median notice time was 518 days for Somali cases, and 507 days for non-Somali cases.

20.     However, in February 2026, the individual-hearing median notice time was just 73 days for Somali cases, while it was 434 days for non-Somali cases.

21.     The median notice times from September 2024 through February 2026 are illustrated below in Figure 2.

---

dataset, I understand that the asylum rule docket, the FERM docket, and the dedicated docket are all specialized dockets that move at an expedited pace. I understand the E33 docket (referring to the EOIR-33 change of address form) to be for respondents who did not yet have a home address on file with the court, or had an erroneous address. I believe "IAD" means "Initial Appearance Docket" and "CFR/RFR" means "Credible Fear Referral/Reasonable Fear Referral." Ultimately, I would expect all of the aforementioned subdockets to have atypical procedural timelines. I chose "Fort Snelling" as the primary subdocket for this immigration court.

The less than 3% of national non-detained Somali cases that were not included in the primary subdockets that I analyzed were therefore on smaller subdockets, like juvenile, dedicated, or E33 subdockets, that I expect to have atypical procedural timelines.

**Figure 2**



22.    Finally, I looked at which IJs the six-month short-notice reassigned Somali cases had been reassigned to.

23.    The Somali respondents whose cases had been reassigned on short notice had listed residences across 33 states and Washington, D.C., with high shares living in Minnesota (55%) and Washington State (17%).

24.    Over 99% of the cases (2,105 out of 2,119) had been redistributed to one of eleven IJs across the country. Over 89% were now assigned to IJs whose home court or courts were outside the state where the respondent resided.

25.     For each of these eleven IJs, I used the EOIR website to determine their home court or courts, as well as their position within court leadership, if any.[8]

26.     As reflected below in Figure 3, one was the Chief Immigration Judge (appointed in December 2025), and four were Assistant Chief Immigration Judges.

27.     I also investigated whether these eleven IJs typically heard exclusively, or primarily, detained cases. I looked at the listed subdockets for each of these IJs' 2025 hearings and counted the proportion of hearings that were demonstrably for detained immigrants (i.e., hearings associated to a specific ICE detention center, a specific detained-only immigration court, or a detained-only subdocket within a larger immigration court).

28.     As reflected below in Figure 3, three of the IJs had exclusively heard detained cases in 2025, and two more had primarily heard detained cases.

29.     In addition, I looked into these eleven IJs' asylum denial rates compared to national averages. To do this, I calculated asylum application denial rates for all of 2025 and the first two months of 2026, both nationally and by individual IJ, using the previous monthly CASE data releases as far back as December 2024. These earlier database snapshots were useful because, while the dataset records the outcome of each asylum application, it does not directly record the date of the decision or the IJ that made the decision. However, by comparing the records for a given asylum application across different monthly data releases, I was able to determine the month in which the application was first marked denied or granted. I then used the input dates and completion dates for proceedings within a case to determine

_____

[8] *Find an Immigration Court and Access Internet-Based Hearings*, U.S. Dep't of Just., https://www.justice.gov/eoir/find-immigration-court-and-access-internet-based-hearings (last visited Mar. 28, 2026).

which IJ had been on the case when the decision was entered. This method successfully identified an IJ for 97% of asylum applications granted or denied in 2025 and 2026.[9]

30.    Nationally, out of all asylum application grants or denials in 2025 and 2026,[10] the denial rate was 81.3%. Out of all IJs who decided at least 50 asylum applications across 2025 and 2026, the median IJ had a denial rate of 85.4%.

31.    As reflected below in Figure 3, ten of the eleven IJs hearing short-notice reassigned Somali cases have higher-than-average asylum denial rates (i.e., higher than 81.4%), and eight of them have denial rates higher than the median IJ (i.e., higher than 85.4%).

---

[9] Based on my inspection of a sample of the data, it's likely that the small number of asylum decisions I did not associate to an IJ are mainly instances where the application decision was recorded late in the CASE database, in the month following the proceeding completion date. One could include in the analysis a one-month grace period for the application decision to be recorded, but to be conservative—to minimize the risk of ascribing the application decision to a subsequent IJ if the case continued in some form—I did not do so.

[10] To avoid overcounting in the event of multiple applications for the same respondent, I ensured that any given case was only counted once in the grant or denial counts. I also excluded any cases where a respondent's application appeared to have been denied *in absentia*, as those would be automatic, non-merits decisions.

**Figure 3**

| Judge | Home court(s) | Position | Detained cases typically | New short-notice Somali cases | Asylum denial rate (2025/2026) |
|---|---|---|---|---|---|
| Tida, Abdias | Houston | IJ | primarily (55.7%) | 356 | 100% |
| Taylor, Philip | Atlanta | IJ | | 309 | 98.6% |
| Riley, Kevin | Los Angeles | Assistant Chief IJ | | 302 | 93.3% |
| Caborn, Andrew | Conroe, TX | IJ | exclusively (99.8%) | 270 | 96.0% |
| Brisack, Chris | Conroe, TX | IJ | exclusively (100%) | 182 | 98.2% |
| Grande, Guy | San Diego | IJ | primarily (52.8%) | 153 | 83.6% |
| Defoe, Craig | Chicago | Assistant Chief IJ | | 131 | 82.6% |
| Ashworth, Sherron | Louisiana | Assistant Chief IJ | exclusively (100%) | 125 | 100% |
| Carbone, Nina | Denver | IJ | | 124 | 72.4% |
| Riley, Teresa | Cleveland | Chief IJ | | 90 | 94.3% |
| Owens, Jonathan | Cleveland/Detroit | Assistant Chief IJ | | 63 | 95.2% |

32.    I reserve the right to supplement this Declaration in light of additional data that may become available.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on March 30, 2026

*Joseph Gunther*
Joseph Gunther (Mar 30, 2026 00:11:24 EDT)

Joseph Gunther

11