**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

HINES IMMIGRATION LAW, PLLC,
*et al.*,

       *Plaintiffs*,

    v.

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW, *et al.*,

       *Defendants*.

Civil Action No. 1:26-cv-01018 (CJN)

**MEMORANDUM OPINION**

The Immigration and Nationality Act governs the admission of aliens to the United States and the removal of aliens previously admitted. But the removal process takes time, usually involving at least one and often two hearings before an immigration judge. Aliens subject to possible removal are either detained or, more often, allowed to reside freely in the country while their claims are heard. Removal proceedings for non-detained aliens can take multiple years, at least in the experience of the lead plaintiff in this case, an immigration law firm in Minnesota: Of that firm's 113 active asylum-seeking clients, most had individual hearing dates set for late 2026, 2027, 2028, or had not yet had their hearings scheduled at all.

That changed earlier this year, when all but two of the firm's non-detained Somali clients had their hearing dates rapidly advanced. Plaintiffs, a single-lawyer firm and a nonprofit organization, both of which work on behalf of aliens residing in Minnesota, allege that this was no coincidence. In their view, the Government has implemented an unwritten policy singling out and expediting the immigration proceedings of non-detained Somali aliens. Arguing that what they

1

call the "Somali Fast-Track Policy" violates the Administrative Procedure Act, Plaintiffs seek to stay the alleged policy and to revert the schedules to their status as of January 26, 2026.

The Government denies that any such policy exists. The Government also argues that Plaintiffs lack standing to bring their claims, that several provisions of the Immigration and Nationality Act prevent the Court from ordering relief, and that because there is no "Somali Fast-Track Policy," Plaintiffs do not challenge a final agency action.

The unrebutted record does suggest some form of coordinated effort directed only at non-detained Somali aliens. But the effects of that effort are felt most directly by the aliens themselves, who are not parties before the Court, and who have their own avenues to challenge removal decisions that violate their constitutional or statutory rights. The organizations bringing this lawsuit allege different and more muted harms, which are not clearly redressable by the Court and which do not seem irreparable. Thus, as explained more fully below, the Court concludes that Plaintiffs have not met their burden of showing that they are entitled to preliminary relief.

## I.    Background

### A.  Statutory and Regulatory Framework

The Immigration and Nationality Act ("INA") generally makes removal proceedings before an immigration judge the "sole and exclusive procedure" for determining whether a noncitizen may be removed from the United States. 8 U.S.C. § 1229a(a)(3). This procedure is run by an immigration judge, or "IJ," who, among other things, receives evidence, examines witnesses, and ultimately determines inadmissibility or deportability and any entitlement to relief from removal. 8 U.S.C. § 1229a(a), (b).

Immigration judges sit within the Executive Office for Immigration Review ("EOIR"), a component of the Department of Justice. Although IJs exercise "independent judgment and discretion" over individual cases, 8 C.F.R. § 1003.10(b), the Office of the Chief Immigration Judge

2

is "responsible for the supervision, direction, and scheduling of the immigration judges." *Id.* § 1003.9(b). And the Director of EOIR can "[d]irect the conduct of all EOIR employees to ensure the efficient disposition of all pending cases," which "includ[es] the power, in [the Director's] discretion, to set priorities or time frames for the resolution of cases; . . . to regulate the assignment of adjudicators to cases; and otherwise to manage the docket of matters to be decided by . . . the immigration judges." *Id.* § 1003.0(b)(1)(ii).

Removal cases generally begin with a "master calendar hearing," followed by an individual merits hearing. At a master calendar hearing, the immigration judge advises the respondent of the nature of the proceedings, the charges, and the right to representation. 8 C.F.R. § 1240.10(a). When a respondent is unrepresented, the immigration judge must also provide information about free or low-cost legal services and permit time to seek counsel. 8 U.S.C. § 1229a(b)(4)(A); 8 C.F.R. §§ 1003.16(b), 1240.10(a)(1)–(2). When a respondent seeks asylum, withholding of removal, Convention Against Torture protection, or other relief from removal, the immigration judge must also hold an individual merits hearing. 8 C.F.R. § 1240.11(c). At that hearing, the respondent must have a reasonable opportunity to present evidence, testify, and examine or cross-examine witnesses. 8 U.S.C. § 1229a(b)(4)(B). Under EOIR's Policy Manual, represented, non-detained aliens generally must file amendments, supporting documents, and similar materials at least thirty days before the individual merits hearing. EOIR Policy Manual, Part II § 2.1(b)(2)(B), https://www.justice.gov/eoir/policy-manual-eoir.

Immigration judges have broad discretion to manage their docket and "may grant a motion for continuance for good cause shown." 8 C.F.R. § 1003.29. "After the commencement of the hearing, the immigration judge may grant a reasonable adjournment either at his or her own instance or, for good cause shown, upon application by the respondent." *Id.* § 1240.6. Immigration

judges may also "set and extend time limits for the filing of applications and related documents." *Id.* § 1003.31(h). Immigration judges are directed to resolve cases "in a timely and impartial manner" and, absent exceptional circumstances, should complete administrative adjudication of an asylum application within 180 days after the application is filed. 8 C.F.R. § 1003.10(b).

### B. Factual Allegations

Plaintiff Hines Immigration Law, PLLC is a Minnesota immigration law firm whose sole attorney, Kelsey Hines, currently represents 113 non-detained asylum applicants before EOIR, including 73 Somalis. ECF No. 1 (Compl.) ¶ 12. Plaintiff Advocates for Human Rights is a Minnesota nonprofit organization that provides immigration-related legal services, including assistance to non-detained Somali respondents in removal proceedings. *Id.* ¶ 13.

Plaintiffs allege that, beginning in late January 2026, EOIR departed from ordinary practice and began implementing what they call a "Somali Fast-Track Policy" for non-detained Somali nationals in immigration court proceedings. *Id.* ¶ 13. Plaintiffs allege that the policy was not publicly announced but is evidenced by hearing notices, scheduling practices, and statements made by immigration judges. *Id.* ¶ 47. This policy has three principal features, according to Plaintiffs. First, EOIR is resetting master calendar hearings in represented, non-detained Somali cases even where such hearings had previously been vacated or were otherwise unnecessary. Second, EOIR is resetting or advancing individual merits hearings on unusually short notice, in some instances moving hearings formerly set for 2027 or 2028 to dates no later than July 2026. Third, EOIR is concentrating these Somali cases before a relatively small subset of immigration judges, many of whom sit outside the venue where the respondent is located and some of whom allegedly have above-average removal rates or below-average asylum grant rates. ECF No. 3-1 (Mot.) at 9.

As to effects on Plaintiffs themselves, the Hines Firm argues that it faces irreparable harm because the alleged policy "upends the timeline on which the firm must prepare for each Somali

4

client's individual merits hearing[.]" *Id.* at 17.  As a result, the firm cannot "meet its core business obligations to both Somali and other clients" while the alleged policy remains in place.  *Id.* at 18. The Hines Firm argues it will suffer both monetary and reputational harm as a result, and that the policy "harms third parties with whom the firm has a close relationship." *Id.* at 19.

As for Advocates for Human Rights, it contends that, without relief, "the Somali Fast-Track Policy will continue to irreparably harm AHR by impairing its core programs, frustrating the organization's mission, requiring AHR to divert resources to meet its communities' critical need for support, and injuring its clients." *Id.*  The organization points to two harms: "First, because the Policy has overwhelmed the capacity of the private attorneys who specialize in this area and with whom AHR frequently partners, AHR has been unable to find volunteer attorneys to handle the new urgent requests for representation from non-detained Somali individuals whose cases are being rapidly advanced." *Id.* at 20.  "Second, because hearings taking place pursuant to the Somali Fast-Track Policy are largely being conducted virtually via Webex, AHR's volunteer court observers have not had access to the proceedings," which "makes it very difficult for AHR to document and report on what is going on during immigration hearings for Somalis." *Id.*

In sum, Plaintiffs argue that the Government's "decision to abruptly fast-track the immigration proceedings of Somali nationals is not only cruel and chaotic, but also unlawful." Mot. at 21.  Plaintiffs assert a number of claims in their Complaint, but their stay motion focuses on their contentions that the policy violates the Administrative Procedure Act because it (1) "contravenes the INA's guarantees that noncitizens have meaningful access to counsel and a full and fair removal proceeding," and (2) "is quintessential arbitrary and capricious agency action, for which there could be no reasoned basis, as Defendants upended the weighty reliance interests of Somali noncitizens and their attorneys when they departed from the long-established status quo in

5

immigration proceedings." *Id.* at 21–22.  Plaintiffs argue that because they face irreparable harm absent a stay and are likely to succeed on the merits of their APA claims, the Court should stay the alleged policy under 5 U.S.C. § 705 and order that all the relevant hearing schedules "shall revert to the status quo in place as of January 26, 2026."  *Id.* at 2; ECF No. 3-20 (Proposed Order) at 2.

## II.    Standard of Review

Section 705 of the APA authorizes a court reviewing an agency action to "issue all necessary and appropriate process to postpone the effective date of [the] agency action or to preserve status or rights pending conclusion of the review proceedings," "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury."  5 U.S.C. § 705.  "A stay is not a matter of right, even if irreparable injury might otherwise result," but is "instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citation modified).  "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  To prevail, "a party seeking preliminary injunctive relief must make a clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation modified).  When the Government is the defendant, the last two factors merge. *Nken*, 556 U.S. at 435.

### III.    Likelihood of Success

The "first and most important factor" is whether the movants "have established a likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  Plaintiffs have not demonstrated that they are likely to succeed on the merits.  In particular, Plaintiffs have failed to demonstrate that their injuries are likely to be redressed by relief that the Court has power to enter.  Plaintiffs also have not established that the alleged policy is one that likely constitutes final agency action amenable to judicial review.

### A.  Plaintiffs Likely Lack Standing

To succeed on the merits, "[a] plaintiff must show a likelihood of success encompass[ing] not only substantive theories but also establishment of jurisdiction," including Article III standing. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation omitted).  A plaintiff's "inability to establish a substantial likelihood of standing requires denial of the motion for [equitable relief]." *Id.*

Plaintiffs argue that they "have organizational standing because the Somali Fast-Track Policy directly interferes with their core activity of providing legal representation and assistance to immigrants, including non-detained Somali noncitizens, in removal proceedings." ECF No. 13 (Reply) at 2.[1]  "[A]n organization may establish Article III standing if it can show that the defendant's actions cause a concrete and demonstrable injury to the organization's activities that is more than simply a setback to the organization's abstract social interests." *Elec. Priv. Info. Ctr. v. Dep't of Com.*, 928 F.3d 95, 100–01 (D.C. Cir. 2019) (internal quotations omitted).

---

[1] Plaintiffs disclaim reliance on associational standing or third-party standing on behalf of non-detained Somali clients.  *See* Reply at 2 n.1.

Of course, the conventional standing requirements also apply. In addition to meeting the organizational standing test, Plaintiffs must still show: (1) an "injury in fact"; (2) a "causal connection between the injury and the conduct complained of"; and (3) a likelihood that the "injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotations omitted). Although the second and third standing requirements—causation and redressability—are often "flip sides of the same coin," redressability can "pose an independent bar in some cases," such as when a plaintiff's injuries are not the kind "'traditionally redressable in federal court.'" *Food & Drug Admin. v. All. for Hippocratic Med. ("Alliance")*, 602 U.S. 367, 380–81 & n.1 (2024) (quoting *United States v. Texas*, 599 U.S. 670, 676 (2023)).

Applying those principles here, the Court finds that while Plaintiffs can likely establish injury in fact and causation, Plaintiffs' injuries are not likely redressable by this Court.

### 1.      Injury in Fact

Determining whether a plaintiff can establish organizational standing requires asking, "first, whether the agency's action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm." *Food & Water Watch*, 808 F.3d at 919 (citation modified). "That framework gives content to the familiar requirements of injury and concreteness as they apply to organizational plaintiffs," as the first question "confirms that the challenged conduct genuinely impaired the organization's ability to operate, and the second ensures that the organization's response was a genuine counteraction of that harm rather than a self-directed expenditure to bring a policy dispute to the courthouse doors." *Robert F. Kennedy Hum. Rts. v. Dep't of State ("RFK")*, No. 25-cv-1774 (JEB), 2026 WL 820811, at *5 (D.D.C. Mar. 25, 2026).

The thrust of the Hines Firm's theory is that its core activity is providing high-quality legal services to non-detained asylum applicants before EOIR. ECF No. 3-2 (Hines Decl.) ¶¶ 8, 13.[2] The fast-track policy, the firm argues, "has dramatically compressed the time in which legal service providers like Plaintiffs must prepare cases for their non-detained Somali clients," making it "nearly impossible for Hines Immigration Law to meet its core business obligations." Reply at 3. That allegation, supported by unrebutted declarations, suffices to show that the Hines Firm can likely establish that the Government's actions (whether through a specific policy or the various decisions by individual immigration judges) "perceptibly impair[s] the organization's ability to provide services." *Food & Water Watch*, 808 F.3d at 919 (internal quotation omitted). In other words, by expediting essentially all of the firm's Somali clients' hearing dates beyond the ability of the firm to cope, *see* Hines Decl. ¶¶ 78–79, the Government's actions have "cause[d] a concrete and demonstrable injury to the organization's activities that is more than simply a setback to the organization's abstract social interests." *Elec. Priv. Info. Ctr.*, 928 F.3d at 100–01.

The next question is whether the firm has "used [its] resources to counteract [that] harm," *Food & Water Watch*, 808 F.3d at 919, without simply "spend[ing] its way into standing." *Alliance*, 602 U.S. at 394. The unrebutted record establishes that Plaintiffs are likely to satisfy this standard. The Hines Firm has added part-time interns, its paralegals have taken on new responsibilities, and everyone is "working more hours than [they] have ever worked before." Hines Decl. ¶¶ 88, 92. Those diversions, which would not be occurring but for the expedited pace of Somali aliens' hearings, are "specific, documented, and directly responsive to the impairment identified." *RFK*, 2026 WL 820811, at *10. The firm has also been "unable to attend" to existing

---

[2] Because only one plaintiff must demonstrate standing, *see Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006), the Court focuses on the Hines Firm, as it has the stronger claim to have suffered cognizable injuries.

clients as thoroughly as before and has decided "to turn away any and all new business," even "remov[ing] the consultation scheduling option from [the firm's] website" and "direct[ing] all potential-new-client calls elsewhere." Hines Decl. ¶¶ 94–95. Such a "diversion of resources from existing programs to counteract" ongoing and challenged actions also suffices to establish organizational standing. *RFK*, 2026 WL 820811, at *10 (summarizing *Humane Soc'y of U.S. v. Dep't of Agric.*, 41 F.4th 564, 567–68 (D.C. Cir. 2022)).

### 2.    Causation

Plaintiffs are also likely to establish causation, which requires them to show that their injuries are "fairly traceable to the challenged action of the defendant," *Lujan*, 504 U.S. at 560 (citation modified), meaning that the chain of causation "must not be too speculative or too attenuated." *Alliance*, 602 U.S. at 383. Plaintiffs' theory of causation is straightforward: But for what they have labeled the "Somali Fast-Track Policy," the Hines Firm could honor all its client commitments and would not face the risk that it "may be fundamentally unable to exist beyond this summer." Hines Decl. ¶ 100. The Government denies that any fast-track policy exists, and so necessarily denies that Plaintiffs' injuries are traceable to it.

But the Government offers no response to Plaintiffs' voluminous declarations or its statistical analysis suggesting that *something* has caused non-detained Somali immigration proceedings, and only non-detained Somali immigration proceedings, to suddenly accelerate in recent months. *See, e.g.*, ECF No. 10-2 (Gunther Decl.) ¶ 6 & n.4. The Court thus credits Plaintiffs' allegations that some shift caused this trend.[3] The Government argues that even assuming the existence of such a policy, "Plaintiffs cannot rely on the independent actions of

---

[3] Whether the alleged policy constitutes final agency action subject to judicial review is a separate question. *See infra* Section III.C.

immigration judges to establish standing because Article III injury cannot be based on the 'independent actions of some third party not before this court.'" ECF No. 11 (Opp.) at 10 (quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 25 (D.C. Cir. 2015)). But the Court of Appeals "has recognized that causation may be established even where the relevant third-party conduct is voluntary, so long as that conduct is reasonably predictable." *RFK*, 2026 WL 820811, at *12 (citing, among other cases, *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 383–84 (D.C. Cir. 2020)). Here, the unrebutted evidence suggests that even assuming the specific expedited scheduling decisions were made by immigration judges personally, such choices would be the "reasonably predictable" results of a directive to fast-track Somali proceedings. At least at this stage, Plaintiffs have shown that they are likely to establish traceability.

### 3. Redressability

The final hurdle is redressability. Although they often overlap, "causation does not inevitably imply redressability." *Renal Physicians Ass'n v. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007). That is partly because, while "[c]ausation looks backward to whether the challenged action set the injury-producing chain in motion," redressability "looks forward to whether a court order would likely or substantially alleviate the injury." *RFK*, 2026 WL 820811, at *13; *see also Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663–64 (D.C. Cir. 1996) (en banc) ("Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff.").

As in *RFK*, the "redressability quandary stems from Plaintiffs' choice of remedy." 2026 WL 820811, at *14. In *RFK,* organizations providing legal services to aliens facing deportation challenged an agreement between the United States and El Salvador that, the court held, had caused the plaintiffs' injuries. *See id.* ("The Court's prior causation analysis treated the Agreement as the catalyst for the events that led to Plaintiffs' injury—a role sufficient for that prong."). But the

11

redressability inquiry hinged on whether vacating that agreement "would deprive [the Government] of the legal authority" to keep carrying out the challenged policy, "or change the practical odds" of the Government doing so. *Id.* Because the court found that vacating the agreement would not achieve either end, it concluded that the relief those plaintiffs sought "would not likely redress their injuries," and thus the plaintiffs lacked standing. *Id.* at 16.

The Hines Firm and AHR face a similar quandary. The weak form of their requested relief would likely not redress their injuries, and the strong form of their requested relief (as discussed in the next section) is likely barred by the INA.

Starting with the weak form, Plaintiffs ask the Court to "stay" the alleged "Somali Fast-Track Policy" pursuant to 5 U.S.C. § 705 pending a final ruling on the merits. Proposed Order at 1. Section 705 does authorize courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. But that provision does not bestow unlimited discretion; it "confirm[s] courts' authority to issue traditional equitable relief pending judicial review." *Texas*, 599 U.S. at 700 (Gorsuch, J., concurring); *cf. Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974) (explaining that § 705 was "primarily intended to reflect existing law"). And the natural way to "issue traditional equitable relief" or "to postpone the effective date of an agency action" here would be to order the Government to stop enforcing the fast-track policy. *See Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313, at *16 (D.C. Cir. Nov. 22, 2025) (statement of Millett & Childs, JJ.) ("[A] stay under Section 705 functions as a 'temporary form of vacatur.'"); *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020) (noting that "vacatur is the normal remedy under the APA") (citation modified).

But here, as in *RFK*, the "practical consequences of vacatur [or a stay] confirm that it would accomplish little." 2026 WL 820811, at *15. After all, and as Plaintiffs acknowledged at the hearing on their motion, simply pausing or vacating the claimed fast-track policy would not, without more, pause or vacate the scheduled hearings in individual aliens' cases. As a result, an order staying the alleged policy would not change the status of the seventy-one "Somali asylum cases [that] have been rapidly advanced in the past month." Hines Decl. ¶ 37. That is because "the conduct that produced Plaintiffs' injuries"—the scheduling of dozens of merits hearings within a few months—would remain "regardless of whether" the Court orders a stay of just the alleged policy. *RFK*, 2026 WL 820811, at *15. In other words, such a stay would do "nothing to redress [Plaintiffs]' injuries" because a "judicial decree rendering the [policy] a nullity does nothing to change the fact that federal officials possess the same underlying [scheduling] discretion," and nothing would "require federal officials to change how they exercise that discretion in the [policy's] absence." *Texas*, 599 U.S. at 691 (Gorsuch, J., concurring).[4]

But Plaintiffs do seek a stronger form of relief. In particular, Plaintiffs propose that, in addition to staying the policy, the Court order

> that all actions taken by Defendants and their officers, employees, and agents to implement [the "Somali Fast-Track"] Policy, including the scheduling or rescheduling of non-detained Somali noncitizens' immigration hearings from January 27, 2026 until the date of this Order, shall be STAYED pursuant to 5 U.S.C. § 705 pending a final ruling on the merits of this case, and the hearing schedules in all such matters shall revert to the status quo in place as of January 26, 2026[.]

---

[4] It is possible that a stay of just the alleged policy might encourage certain IJs to slow down their processing of Somalis' cases. But that is just conjecture, and courts do not "measure redressability by asking whether a court's legal reasoning may inspire or shame others into acting differently." *Texas*, 599 U.S. at 691 (Gorsuch, J., concurring). Rather, because it is "a federal court's judgment, not its opinion, that remedies an injury," "it is the judgment, not the opinion, that demonstrates redressability." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023).

Proposed Order at 1–2.  To be sure, this strong form of relief would be more likely to redress Plaintiffs' harms; the hearings currently scheduled for the coming months would "revert to the status quo in place as of January 26, 2026," meaning that they would occur in "late 2026, in 2027, or in 2028."  Hines Decl. ¶ 38.  Putting aside that such relief would be akin to requiring the Court to micromanage or otherwise reach into individual IJs' schedules, such relief likely cannot redress Plaintiffs' injuries for the reason discussed immediately below:  "Put simply, the remedy that would ordinarily have the best chance of redressing [Plaintiffs'] harms is a forbidden one in this case."  *Texas*, 599 U.S. at 690 (Gorsuch, J., concurring).

### B.  The INA Likely Bars the Remedies Necessary to Establish Standing

At least two provisions of the INA likely preclude the Court from ordering the strong form of relief proposed by Plaintiffs—that is, an order requiring all non-detained Somali cases to revert to their schedules as of January 26, 2026.[5]

### 1.      Section 1252(f)(1)

The Government argues that 8 U.S.C. § 1252(f)(1) bars the Court from granting Plaintiffs' requested relief.  *See* Opp. at 17–20.  That provision provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the

---

[5] The Government argues that a third INA provision, § 1252(g), forecloses judicial review of Plaintiffs' claims.  But as the Supreme Court stated in *Reno v. Am.–Arab Anti–Discrimination Comm. (AAADC)*, that provision only covers the "three discrete actions" that § 1252(g) allows the Attorney General to take: the "decision or action" to "commence proceedings, adjudicate cases, or execute removal orders."  525 U.S. 471, 482 (1999).  Because this lawsuit challenges scheduling decisions, *AADC* seems to foreclose reading § 1252(g) as a "general jurisdictional limitation" that bars Plaintiffs' claims.  *Id.*  Indeed, the Court in *AADC* explicitly contrasted the decision to "reschedule" a "deportation hearing" with the "three discrete actions" described above.  *Id.*

> application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).

The core precedent interpreting this provision is *Garland v. Aleman Gonzalez*, which held that § 1252(f)(1) "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" the INA. 596 U.S. 543, 550 (2022). The Government argues that the stay requested by Plaintiffs is such an order, as it would "'restrain' the agency's actions with respect to § 1229a." Opp. at 17. Plaintiffs claim that they do not seek preliminary *injunctive relief* but merely "ask the Court to *stay* the Somali Fast-Track Policy pursuant to § 705 of the APA." Reply at 14 (emphasis added). In their framing, a stay is more akin to vacatur or declaratory relief than a preliminary injunction. *Id.* at 14–15; *see also Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 990 (9th Cir. 2025) (holding that "§ 1252(f)(1) does not bar" a stay pursuant to § 705 of the APA pending further review of the merits of an APA challenge).

The problem for Plaintiffs is that if the Court is to order the strong form of relief that is likely to redress their injuries for Article III purposes—that is, to order that the schedule in all affected proceedings must revert to the schedules that existed on January 26, 2026—such relief looks much more akin to the kind of injunctive relief that *Aleman Gonzalez* forecloses. By delaying removal proceedings already pending before immigration judges, such relief would "enjoin or restrain the operation of the provisions of" Section 1229a of the INA, which provides that immigration judges "shall conduct proceedings for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1252(f)(1); § 1229a(a)(1). So while Plaintiffs are correct that there generally "are meaningful differences between an injunction . . . and vacatur," Reply at 15, those differences are vanishingly small in the context of the relief they actually seek. Like the

15

injunction held improper in *Aleman Gonzalez*, if the Court were to grant Plaintiffs the strong form of relief they propose, it would be ordering immigration officials to "refrain from actions that . . . are allowed by" the statute. *Aleman Gonzalez*, 596 U.S. at 551; *see also id.* at 550 (agreeing with the Government that § 1252(f)(1) refers "not just to the statute itself but to the way that [it is] being carried out").[6]

### 2.     Section 1252(b)(9)

While Section 1252(f)(1) likely prevents the Court from entering the kind of relief that would redress Plaintiffs' harms, Section 1252(b)(9) likely precludes the Court from exercising jurisdiction at all. That provision, known as the INA's "zipper clause,"[7] provides:

> With respect to review of an order of removal under subsection (a)(1) . . . [j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, *arising from any action taken or proceeding brought to remove an alien from the United States* under [8 U.S.C. §§ 1151–1385] shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or

---

[6] Plaintiffs cite what they conceded at oral argument is a nonbinding opinion from a Court of Appeals stay panel that declined to apply *Aleman Gonzalez* in the context of a Section 705 stay. *See Make the Rd. New York*, 2025 WL 3563313, at 15–18. For the reasons discussed above, the Court concludes that whatever the propriety of Section 705 stays in the abstract, the stay sought here is better viewed as a request for preliminary injunctive relief. The Court acknowledges that *Aleman Gonzalez* did not address whether § 1252(f)(1) "not only bars class-wide injunctive relief but also prohibits any other form of relief that is practically similar to an injunction." *Aleman Gonzalez*, 596 U.S. at 551 n.2 (internal quotations omitted); *Make the Rd. New York*, 2025 WL 3563313, at 17 (noting that footnote). But, of course, *Aleman Gonzalez* did not foreclose applying § 1252(f)(1) to stays sought under § 705 either. In the Court's view, the logic of *Aleman Gonzalez* likely applies to situations like this case as well.

[7] The Supreme Court characterized § 1252(b)(9) as a "zipper clause" in *AADC*, explaining that the statute's purpose "is to consolidate 'judicial review' of immigration proceedings into one action in the court of appeals[.]" 525 U.S. at 483.

16

> nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9) (emphasis added).

Plaintiffs argue that because the provision states that it "applies only with respect to review of an order of removal," it has no application here. Reply at 7. But as Judge Moss has explained, although "[r]ead literally, that language might dispose of [the Government's] § 1252(b)(9) defense" because Plaintiffs "do not seek review of 'an order of removal,'" a literal "reading of the statute proves too much and would, among other things, render § 1252(b)(9) meaningless." *O.A. v. Trump*, 404 F. Supp. 3d 109, 130 (D.D.C. 2019) (quoting *INS v. St Cyr*, 533 U.S. 289, 332 (Scalia, J., dissenting)). "That is, if § 1252(b)(9) applies only to the review of final orders of removal, what work is done by its channeling of 'all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien' into review of the 'final order' of removal?" *Id.* (quoting 8 U.S.C. § 1252(b)(9)). The answer, as this Court previously concluded in a different case, is that § 1252(b)(9) has a broader reach: It means that "all claims—whether statutory or constitutional—that 'aris[e] from' immigration removal proceedings can only be brought through the petition for review process in federal courts of appeals." *Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.*, 456 F. Supp. 3d 16, 29 (D.D.C. 2020) (Nichols, J.) (quoting *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029 (9th Cir. 2016)).

*Nat'l Immigr. Project* is instructive. There, several plaintiffs—including three organizations whose members represented aliens in immigration proceedings—challenged immigration court and detention facility policies implemented in response to the COVID-19 pandemic. *Id.* at 20. Those plaintiffs advanced claims similar to those here: namely, that the new policies harmed the organizations' ability to provide legal representation and violated the APA. *See id.* at 24. But the Court held that those claims arose from the course of removal hearings,

17

"placing them within § 1252(b)(9)'s broad jurisdictional bar." *Id.* at 29.  So too here.  Plaintiffs challenge scheduling actions "arising from" "proceeding[s] brought to remove" aliens from the United States.  8 U.S.C. § 1252(b)(9).  Because "Congress intended to channel all claims arising from removal proceedings, including right-to-counsel claims, to the federal courts of appeals and bypass the district courts," *J.E.F.M.*, 837 F.3d at 1033, § 1252(b)(9) likely bars this suit.

Plaintiffs' counterarguments are unavailing.  Relying on *Mass. Coal. for Immigr. Reform v. Dep't of Homeland Sec.*, Plaintiffs first argue that because they are organizations bringing the claims on behalf of themselves, not their clients, § 1252(b)(9) does not apply.  Reply at 7; *see* 621 F. Supp. 3d 84, 99 (D.D.C. 2022) (holding that, because plaintiffs "will never be subject to a removal proceeding under the INA," "there will never be a final order of removal through which they could" bring their challenge, which could thus proceed).  But *Coal. for Immigr. Reform* does not bind the Court and is distinguishable in any event.  The relevant discussion in that case addressed a claim that the Attorney General's decision to reinstate "administrative closure" in immigration courts should have received environmental analysis under NEPA.  *Id.* at 97–98.[8]  The court reasoned that "[e]ven though the new administrative closure regime technically 'arises from' a removal proceeding," § 1252(b)(9) did not bar the NEPA claim because there was no other way the plaintiffs "could challenge the lack of environmental analysis before the Attorney General's reinstatement of administrative closure."  *Id.* at 99.

The claims Plaintiffs assert here do not resemble that NEPA-based claim.  Instead, Plaintiffs' claims squarely concern removal proceedings:  They object to the pace at which certain

---

[8] "Administrative closure is a docket management tool that allows immigration judges to remove cases from their active calendar without deciding the merits," leaving the case in an "adjudicatory limbo for an indefinite period of time."  *Coal. for Immigr. Reform*, 621 F. Supp. 32 at 97 n.2; *id.* ECF No. 17 ¶ 113 (*Coal. for Immigr. Reform* amended complaint).

removal hearings are being set, which is the kind of claim that can ordinarily only be reviewed after a "final order of removal." 8 U.S.C. § 1252(a)(1). As this Court has concluded previously, § 1252(b)(9) bars "claims challenging policies-and-practices that are applied during the course of a removal proceeding." *Nat'l Immigr. Project*, 456 F. Supp. 3d at 29. The "only exception," which Plaintiffs lean on heavily in their brief, "is if a plaintiff challenges 'the validity of a regulation of general applicability based on the administrative record generated in rulemaking.'" *Id.* (quoting *O.A.*, 404 F. Supp. 3d at 128; *see* Reply at 10–11 (arguing that Plaintiffs' "challenge to 'the validity of a regulation of general applicability' falls within the 'exception to [§ 1252(b)(9)'s] bar that has been recognized in this circuit'")).

But the scope of the § 1252(b)(9) carve-out covers only challenges "to the validity of a regulation of general applicability *based on the administrative record generated in the rulemaking*." *O.A.*, 404 F. Supp. 3d at 128 (emphasis added); *cf. Nat'l Immigr. Project*, 456 F. Supp. 3d at 29 (recognizing this as § 1252(b)(9)'s "only exception"). Given that the alleged fast-track policy is either unwritten or non-existent, there is no "administrative record" or "rulemaking" to challenge. Further, in *O.A.* the challenged policy was "not an 'action taken . . . to remove an alien from the United States,' and was not promulgated as part of a removal 'proceeding.'" 404 F. Supp. 3d at 132 (quoting 8 U.S.C. § 1252(b)(9)). But here, the challenged policy, assuming it exists, *is* best understood as an action taken to remove aliens; the whole purpose of the alleged policy is to kickstart removal proceedings.

Plaintiffs are thus left to invoke the plurality opinion in *Jennings v. Rodriguez*, which directed courts to "eschew[] uncritical literalism" in interpreting the phrase "arising from." 583 U.S. 281, 293 (2018) (internal quotations omitted); Reply at 7. The Court in *Jennings* held that § 1252(b)(9) did not deprive federal courts of jurisdiction to adjudicate a class action brought by

19

aliens arguing that they could not be detained for over six months without a bond hearing. Writing for the plurality, Justice Alito stated that "the applicability of § 1252(b)(9) turns on whether the legal questions that [the Court] must decide 'aris[e] from' the actions taken to remove these aliens." *Id.* at 293. While the aliens' unreasonable detention claims could literally be said to arise from their removal proceedings, such an "expansive interpretation of § 1252(b)(9) would lead to staggering results"—precluding, for example, *Bivens* actions challenging inhumane conditions of confinement until review of the final removal orders. *Id.* Such an interpretation, the plurality wrote, "would be absurd." *Id.*

But the reach of *Jennings* is uncertain and self-consciously narrow. As the plurality noted, the parties had "not addressed the scope of § 1252(b)(9)," and it was "not necessary for [the Court] to attempt to provide a comprehensive interpretation." *Id.* at 294. Rather, it was "enough to note that" the plaintiffs were "not even challenging any part of the process by which . . . removability w[ould] be determined." *Id.* The legal questions their claims presented were thus "too remote" to "fall within the scope of § 1252(b)(9)." *Id.* at 295 n.3. Plaintiffs' claims in this case are far less remote, as they concern not detention but the "proceedings for deciding . . . inadmissibility or deportability." 8 U.S.C. § 1229a(a)(1). The Court therefore concludes that § 1252(b)(9) likely bars claims arising from the Government's decision to schedule removal proceedings more rapidly. As in *Nat'l Immigr. Project*, Plaintiffs' "claims arise as a 'part of the process by which . . . removability will be determined,' *Jennings*, 583 U.S. at 294, and this Court thus lacks jurisdiction over them." 456 F. Supp. 3d at 30.[9]

---

[9] A contrary interpretation would also implicate anti-circumvention principles. Because § 1252(b)(9) bars aliens from challenging their new hearing dates outside the context of review of a final order of removal, it makes little sense if organizations representing those aliens could challenge the new hearing dates instead in a collateral attack. *See Cummings v. Missouri*, 71 U.S. 277, 325 (1866) ("[W]hat cannot be done directly cannot be done indirectly.").

### C.  The Alleged Policy is Likely Not Final Agency Action Subject to Judicial Review

A final obstacle in the path of Plaintiffs' likelihood of success on the merits is the APA's final agency action requirement.[10]  That is, Plaintiffs must establish that the alleged fast-track policy is a "final agency action" in the sense contemplated by the APA.  5 U.S.C. § 704.  An agency action is considered "final" when two conditions are met: (1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and internal quotations omitted).

The Government argues that Plaintiffs cannot establish that the alleged policy even exists, much less that the policy marks the consummation of the agency's decisionmaking process. "Further," the Government argues, "Plaintiffs seek a blanket stay of a sub-set of immigration removal proceedings," Opp. at 22, which are not final until a decision to issue a removal order is reached.  As to the first point, the Government has not persuaded the Court of the non-existence of some action, in some form, that caused Somali (and only Somali) cases to accelerate.  Plaintiffs' voluminous declarations from affected parties and an independent data analyst provide the Court with reason to believe that some action induced immigration judges to begin processing non-detained Somali cases at a rapid pace.  That the policy has not been acknowledged or promulgated is not fatal to Plaintiffs' claims if the policy's existence can be inferred by the actions of others. *See Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020)

---

[10] Because it denies the existence of any Somali fast-track policy whatsoever, the Government does not attempt to defend it on the merits.

("Agency action generally need not be committed to writing to be final and judicially reviewable[.]").

The closer question is whether the policy is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78. Plaintiffs contend that the alleged policy "robs immigration judges of [their] discretion by putting non-detained Somali cases on an accelerated timeline writ large." Reply at 18. But Plaintiffs have not shown that individual IJs have lost the capacity to manage their dockets; indeed, the lead plaintiff admits that at least one immigration judge "has granted several of [her] motions to continue." Hines Decl. ¶ 50. Further, given that EOIR's authority "includ[es] the power" to set "time frames for the resolution of cases" and "to regulate the assignment of adjudicators to cases," 8 C.F.R. § 1003.0(b)(1)(ii), it is not clear that any immigration judges experienced material changes to their legal obligations. That is relevant because, "if the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review." *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005).

The Court takes Plaintiffs' point that "the decision to fast-track proceedings and the decision to enter a removal order are distinct." Reply at 19. But a policy that merely tells immigration judges to do their jobs faster is only reviewable final action if that policy "itself determines rights or obligations or alters the legal regime governing those the agency is charged to regulate." *RFK*, 2026 WL 820811, at *16. If the policy is better conceived of as "a nonbinding instrument," encouragement to move faster but nothing more, "it does not." *Id.* at 17. In that event, "any legal consequences arise" not from the challenged policy but from the individual "implementing action[s]" of the IJs themselves, who ultimately decide when given hearings are scheduled and whether to grant continuances. *Id.*

All of this is of course complicated by the amorphousness of the challenged policy, the Government's complete denial of its existence, and the posture of this motion, which requires the Court to determine what Plaintiffs are "likely" able to establish. *Nken*, 556 U.S. at 434. Plaintiffs contend that the fast-track policy should be "defined as Defendants' policy of singling out and expediting the immigration proceedings of non-detained Somali noncitizens on a dedicated national docket, which Defendants began implementing no later than January 27, 2026." Proposed Order at 1. But, as just explained, such a policy, assuming it exists, would not necessarily "alter[] the legal regime" on its own accord if individual IJs still set their own schedules. *RFK*, 2026 WL 820811, at *16. The finality "inquiry focuses on what the [challenged policy] itself does legally, not on what downstream events it helped produce." *Id.* at 18.

A recent decision by the Court of Appeals, *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026), is particularly instructive. There, plaintiffs challenged an IRS-ICE memorandum of understanding for sharing taxpayer address information in connection with immigration enforcement. *Id.* at 1223. The Court of Appeals held that "the MOU is a nonbinding, nonfinal policy statement that is not reviewable under the APA" in part because the MOU "was not the product of notice-and-comment rulemaking" and the "IRS has never characterized it as a 'rule.'" *Id.* at 1236. Affirming the district court, the Court of Appeals left undisturbed the conclusion that "[a]ny substantive change" attributable to the MOU stemmed not from the MOU itself but "from the Administration's decision to use . . . statutorily authorized tools" to further its enforcement objectives. *Id.* at 1228. A similar analysis applies here. Obviously, the policy the Government denies exists was "not the product of notice-and-comment rulemaking" and has never been characterized as a "rule." *Id.* at 1236. Further, any legal consequences stem from later exercises of IJs' authority to manage their own dockets rather than an unwritten policy that may

or may not exist. In other words, whatever consequences the alleged fast-track policy "set in motion, the consequences Plaintiffs identify flow from [IJs'] subsequent exercise of statutory authority" rather than the challenged policy itself. *RFK*, 2026 WL 820811, at *18.

Of course, the Court's conclusion that the alleged policy is likely not reviewable final agency action is only tentative. As this litigation proceeds, more details about the existence and contours of this policy may emerge. But in the preliminary relief posture, uncertainty cuts against Plaintiffs, as "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken*, 556 U.S. at 433–34.

* * *

To sum up so far: To prevail on their motion for a stay, Plaintiffs must establish that their claim is likely to succeed on the merits. To make that showing, Plaintiffs must show that they are likely to establish that they have Article III standing, that no provision of the INA bars this Court from hearing this case or providing necessary relief, and that the policy they seek to stay is final agency action. "But even a tentative adverse conclusion can undermine [Plaintiffs]' likelihood of success," and, "to prevail, [Plaintiffs] must run the table; they face the daunting task of surmounting *all* of these significant obstacles." *Ohio v. EPA*, 603 U.S. 279, 322 (2024) (Barrett, J., dissenting). For the reasons discussed above, they have not made that showing.

IV.    Remaining Equitable Factors

The remaining equitable factors, of course, ask whether Plaintiffs "will be irreparably injured absent a stay," "whether issuance of the stay will substantially injure the other parties interested in the proceeding," and "where the public interest lies." *Nken*, 556 U.S. at 434. Those factors also do not weigh in favor of staying the alleged policy.

24

### A.  Irreparable Harm

"[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.  The Court of Appeals "has set a high standard for irreparable injury," requiring that the harm "must be both certain and great," "actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation omitted).  The moving party must also show "the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citation modified).

The Hines Firm argues that, absent a stay, it will suffer monetary and reputational harms, which together will amount to "existential threats to the business itself."  Reply at 20. "Recoverable monetary loss may constitute irreparable harm . . . where the loss threatens the very existence of the movant's business." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  But "[a]lleged harm that is even in part self-inflicted by the plaintiff[s'] own inaction is not irreparable so as to warrant relief." *Ardelyx, Inc. v. Becerra*, No. 24-cv-2095, 2024 WL 5186613, at *12 (D.D.C. Dec. 20, 2024) (citation modified).  The Hines Firm was certainly entitled to build its practice around the non-detained docket because it allowed "more clients at a slower and more predictable pace."  Hines Decl. ¶ 13.  But it is the firm's own decision to apparently stick with that business model—which depended on long lead times, a single-attorney structure, and a large non-detained caseload—while attempting to represent all of its existing clients pursuant to all of the new schedules.  The same is true for the firm's fee-structure which, while reflecting the "practice of immigration law as [the firm had] previously known it," Hines Decl. ¶ 89, remains the prerogative of the firm's owner to change.  The Court certainly recognizes that the firm would rather maintain the status quo, but it has not established that reasonable changes to its model and

practice, which it can make itself, would not substantially (if not entirely) alleviate any harm it might suffer while this case is pending.

Plaintiffs are also "correct that harm to reputation can, in certain circumstances, constitute irreparable injury," but "the showing of reputational harm must be concrete and corroborated, not merely speculative." *Achagzai v. Broad. Bd. of Governors*, No. 14-cv-768, 2016 WL 471274, at *4 (D.D.C. Feb. 8, 2016) (internal quotations omitted). Nothing in Plaintiffs' declarations convince the Court that their reputational harms are likely to be irreparable or, indeed, even substantial. The Hines Firm contends that its "reputation can be undone in a matter of moments" as a result of both its "Somali and non-Somali clients . . . becom[ing] frustrated and disappointed with the management of their cases and [the firm's] capacity to provide representation." Hines Decl. ¶ 98. But those assertions are uncorroborated, as the firm "has not identified anyone who thinks less of [it] based on [its] performance." *Achagzai*, 2016 WL 471274, at *4. If anything, an opposite reaction strikes the Court as equally reasonable; clients may recognize that despite "unprecedented circumstances" confronting the firm, Hines Decl. ¶ 106, the firm is moving heaven and earth to serve them.

In short, while the harm confronting Plaintiffs is not trivial, "simply showing some possibility of irreparable injury fails to satisfy the second factor." *Nken*, 556 U.S. at 434–35 (internal quotations and citation omitted).[11]

---

[11] The harms AHR asserts also do not appear irreparable. According to AHR, the alleged policy has impaired AHR's work by "forcing it to divert staff time from its core programs to meet the pressing needs that the Policy creates." Mot. at 36; *see also, e.g.*, ECF No. 3-3 ¶ 29 (declaration stating that AHR has "so far been unable to pull together volunteer attorneys to handle . . . urgent new cases"). AHR also complains that the newly scheduled virtual hearings deny the organization's staffers access to the proceedings. But its declaration identifies only "at least one instance" of denied virtual observation. *See id.* ¶ 36. In any event, "operational disruptions and inefficiencies . . . are simply not the kind of devastating irreparable economic losses" that qualify as irreparable harm. *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 97 (D.D.C. 2003).

### B. Balance of the Equities and Public Interest

The two remaining factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.  When a party "seek[s] to stay the enforcement of a federal regulation against them, often the harms and equities will be very weighty on both sides." *Ohio*, 603 U.S. at 291 (citation modified).  There is, for instance, "always a public interest in prompt execution of removal orders." *Nken*, 556 U.S. at 436.

Plaintiffs' arguments on the equities overlap significantly with their arguments on the merits.  Plaintiffs quote several cases to the effect that "the Government cannot suffer harm from an injunction that merely ends an unlawful practice," "there is a substantial public interest in having governmental agencies abide by" federal law, and the "public interest is served when administrative agencies comply with their obligations under the APA."  Mot. at 36.  But those arguments assume that Plaintiffs have established a likelihood of success on the merits, which (as the Court has already discussed) is not the case.  Beyond that, Plaintiffs' inability to show that the balance of the equities clearly weighs in their favor cautions against granting a stay.  As the Court of Appeals has reiterated, "[b]ecause injunctions can irreparably injure parties, courts must use great caution, granting them only in cases where they are clearly indispensable to the ends of justice." *Hanson v. District of Columbia*, 120 F.4th 223, 243 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2778 (2025).  On the current record, Plaintiffs have not shown that equitable relief is so clearly indispensable to entitle them to that "extraordinary remedy." *Nken*, 556 U.S. at 428.

### V.   Conclusion

For the foregoing reasons, Plaintiffs are not entitled to a stay at this stage of the litigation and based on the present record.  A separate Order will issue contemporaneously.

DATE:  April 10, 2026

CARL J. NICHOLS
United States District Judge

27